OPINION OF THE COURT
Sheldon M. Rand, J.
The proceeding before this court presents issues regarding the termination of parental rights only recently acknowledged by the courts. The petitions with which we are here concerned alleged that respondent Maria N. is, by reason of mental illness, unable, for the present and foreseeable future, to provide proper and adequate care for her three minor children. The petitions also alleged that respondent’s husband Roberto N. abandoned the children. After a fact-finding hearing held May 22, 1980 the court issued a written decision which terminated the parental rights of Roberto N. As to respondent Maria N. the court found that there was clear and convincing evidence of Ms. N.’s mental illness, and ordered a dispositional hearing to be held.
It is at this juncture that this case becomes procedurally unique. This court is unaware of any decisions, save one, in which subdivision 6 of section 384-b of the Social Services Law was construed to require a dispositional hear *764 ing when the petition for termination is based on allegations of mental illness. (See Matter of Daniel A.D., 106 Misc 2d 370.) Moreover, no such hearing was ever held.
A reading of section 384-b of the Social Services Law in conjunction with part 1 of article 6 of the Family Court Act, as mandated, provides the requirement of a dispositional hearing after fact finding when a petition alleges that a child is a permanently neglected child. (See Social Services Law, § 384-b, subd 3, par [f|; Family Ct Act, §§ 611, 623.) The time sequence of these hearings obviously depends on the individual case. Indeed, subdivision (a) of section 625 of the Family Court Act provides for the dispositional hearing immediately after the fact-finding hearing and subdivision (b) of section 626 of the Family Court Act permits the court to adjourn the proceedings prior to the disposition in order to make further inquiry.
There is no statutory authority for a dispositional hearing when a petition for commitment of a child alleges abandonment by the natural parent, but recent cases have determined that it is within the Judge’s discretion to order a dispositional hearing in such a case. (Matter of Wesley L., 72 AD2d 137; Matter of Maeru P., 104 Misc 2d 895 [Kaplan, J.].) As stated in Matter ofMaeru P. (supra, p 897): “The filial bond is one of the strongest, yet most delicate and most inviolable of all relationships. (Matter of Corey L v Martin L, 45 NY2d 383.) The court must not move to sever it without a scrupulous regard to the rights and responsibilities of the natural parent.”
Throughout section 384-b of the Social Services Law and the body of law regarding custody of children exists the common thread of the best interests of the child. (See Social Services Law, § 384-c, subd 3, pars [i], [k], as well as the introductory section, § 384-b, subd 1, par [b]; Matter of Bennett v Jeffreys, 40 NY2d 543; Matter of Daniel A.D., supra.)
The determination of the best interests of the child is no less important when there are allegations of parental mental illness than when there are allegations of permanent neglect.
*765 Surely, the concept of best interests is nebulous at best, undefinable at worst. “The phrase, ‘best interests of the child,’ means all things to all people: it means one thing to a juvenile judge, another thing to adoptive parents, something else to natural parents, and still something different to disinterested observers.” (State ex rel. Lewis v Lutheran Social Servs. of Wis. & Upper Mich., 59 Wis 2d 1, at p 9.)
Nevertheless, the difficulty of defining best interests can in no way prevent the court from reaching the issue.
Clearly, as in the situation of an abandoning parent, there will not always be a need for further “inquiry into the surroundings, conditions, and capacities of the persons involved in the proceedings.” (Family Ct Act, § 626, subd [b].) A family resource as an alternative to termination of parental rights and future adoption is no less a resource when the parent is neglectful than when the parent is mentally ill. Since the fact finding is just that, a finding that the facts alleged in the commitment petition are supported by the evidence, the issue of the best interests of the child may not immediately be reached.
A more pragmatic approach to all petitions for termination of parental rights is to eliminate the distinction between the petitions that arise solely on the basis of the allegations contained in them. We urge the Legislature to take such action, and until such time as that is done, the court will order, in its discretion, dispositional hearings in any appropriate cases. It should be noted that not every case alleging permanent neglect requires a dispositional hearing and section 625 of the Family Court Act provides for dispensing with the hearing altogether.
Another reason exists for holding a dispositional hearing when parental mental illness is alleged. Scientific advances have been made in the use of medication to control behavior considered mentally ill. Subdivision 6 of section 384-b of the Social Services Law defines “mental illness” for statutory purposes as: “an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking or judgment to such an extent that if such child were *766 placed in or returned to the custody of the parent, the child would be in danger of becoming a neglected child as defined in the family court act.”
Some of the mental conditions that are encompassed by the above definition are organic brain conditions, conditions caused by infections or head injuries, and manic-depression. Schizophrenia is also one of these mental conditions, and the use of antipsychotic drugs has become widespread in its treatment and control. Thorazine, Prolixin, Mellaril, Stelazine and Haldol are all psychotropic drugs, which direct the operations of the mind. They are used to suppress psychotic behavior, and aid the patient in maintaining contact with reality. Exactly how these drugs work is not known, but their benefits are observable.
Admittedly, these drugs produce certain side effects, such as Parkinson-like tremors and neuromuscular problems. In order to eliminate these side effects, other drugs such as Cogentin and Artane are taken in conjunction with the antipsychotic drugs. Moreover, not all the drugs produce the same side effects, so a physician can substitute medications and alter dosages until the optimum result is reached. It is clear that the benefits of the anti-psychotic drugs outweigh the problems accompanying their use. The legal profession must keep abreast of these advances, since they may have a direct bearing on many issues of law.
These drugs have the effect of restoring a person to his/her prepsychotic state. Thus, if an individual had a well-integrated personality before experiencing a psychotic episode, then the drugs should re-establish that integrated personality, allowing functioning at prepsychotic levels. Conversely, with a poorly integrated prepsychotic personality, the use of drugs would not serve to reintegrate the personality.
This indicates the need to examine all the various components of a diagnosis of mental illness. Of vital importance is ascertaining the person’s condition prior to the manifestation of the mental illness, and the course of treatment is relevant as well, since it bears directly on *767 the parent’s ability to provide the statutorily required proper and adequate care.
These questions may arise tangentially during the fact finding but since so many factors comprise mental illness, its diagnosis and treatment, a further inquiry in the form of a dispositional hearing may often be justified.
In fulfilling its obligation of making a disposition that is in the best interests of the child, all this information must be made available to the Judge.
The court finds that even though the Social Services Law and the Family Court Act do not make special provision for a separate dispositional hearing in a commitment proceeding based on parental mental illness, it is wholly within the sound discretion of the Judge to order such a hearing in appropriate cases.
The court is cognizant of two recent decisions declaring section 384-b (subd 4, par [c]; subd 6, par [a]) of the Social Services Law unconstitutional. (Matter of Gross, 102 Misc 2d 1073; Matter of Mendes, 104 Misc 2d 357.) In those decisions, Judge Kevin C. Fogarty found that: “section 384-b of the Social Services Law violates the constitutional rights of respondent mother by depriving her of her children solely because of her mental illness and by intervening into the constitutionally protected rights of both parent and child beyond what is necessary to meet the State’s interest.” (Matter of Mendes, supra, at pp 365-366.)
Nearly 40 years ago, the United States Supreme Court dealt with this precarious situation in Prince v Massachusetts (321 US 158, 166). “It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.”
However, the court also acknowledged that the family unit is not beyond regulation. All States exercise, in one form or another, their duties and obligations as parens patriae. New York’s statutory scheme is one in which the rights of neglectful, abandoning and mentally ill or mentally retarded parents may be terminated, with the pro- *768 visa that such termination is in the best interests of the child.
“Constitutional recognition for and guarantee of parental autonomy is not intended, however, to shield the parent who fails to provide his child with adequate physical care. The autonomy accorded parents is premised upon the use of parental power to benefit the child.” (Rights of Children, 46 Ford L Rev 723 [emphasis added]; see, also, Matter of Leon R.R., 48 NY2d 117.)
New York includes in its protection children whose parents would fail to provide adequate physical, mental or emotional care if the children were returned to their care and custody. (Social Services Law, § 384-b, subd 6, par [a]; Family Ct Act, § 1012, subd [f], par [i].) This provision applies to parents who are within the statutory categories of mentally ill or mentally retarded. This distinction between mentally ill or retarded parents and neglectful or abusive parents is part of the basis of the alleged unconstitutionality of the statute. (Matter of Gross, supra.)
Taking into account the potential damage to a young child exposed to a mentally ill parent, this court finds that the statutory distinction is rational. In comparing the child’s fundamental rights with those of the parent, we are led to the conclusion that “the parent’s interest in preserving the relationship is overridden only when the parent’s guardianship and custody would lead to an unfair deprivation for the child, one the State has a valid interest in preventing.” (Matter of Daniel A.D., 106 Misc 2d 370, 376, supra.)
Furthermore, the statutory scheme requires clear and convincing evidence that the parent, by reason of mental illness or retardation, cannot now and for the foreseeable future provide proper and adequate care for the child. (Social Services Law, § 384-b, subd 3, par [g].) This greater standard of proof required of those seeking the termination of parental rights provides additional safeguards for the parent.
The statute represents, constitutionally, New York’s method of dealing with the difficult balance that must be struck between the acknowledged primacy of the natural *769 parent’s rights and the best interests of the child. (See Corey L v Martin L, 45 NY2d 383.)
The court is convinced that the statute is constitutional as written, and the direction for a dispositional hearing is within the bounds of judicial discretion, so we now move to the facts of the instant case.
Respondent Maria N. is a 25-year-old woman, and the mother of three children, Melissa born October 4, 1975, Socorrito born January 6,1977 and Roberto born June 25, 1978. All three children have been in placement since shortly after their births.
At the fact-finding hearing, the testimony of a psychiatrist appointed to examine the respondent was taken, as required by section 384-b (subd 6, par [e]) of the Social Services Law.
His diagnosis was that respondent had a chronic psychiatric problem accompanied by periodic acute psychotic episodes. This conformed to the record of Ms. N.’s prior psychiatric hospitalizations, of which there have been several. The diagnosis has consistently been schizophrenia.
At the hearing, the court was made aware of Ms. N.’s present participation in an out-patient clinic at the Bernstein Institute of the Beth Israel Medical Center. In view of this information, as well as the court’s close observation of Ms. N. throughout the hearing, the court required more evidence regarding the “surroundings, conditions, and capacities” of Maria N., the natural mother. To that end, the court ordered an updated Mental Health Services examination to be conducted on the natural mother, and the Bernstein Institute records were judicially subpoenaed for the use of the second examining psychiatrist, Dr. John V. Abbott. A home visit by the agency was also ordered.
Dr. Abbott testified at the dispositional hearing on January 14, 1981. His testimony was thorough and he was consistent in his assertion that Ms. N. would not be able to tolerate the stresses of parenthood.
The doctor stated that although it appeared that respondent was indeed in remission, her functioning was optimum at present, and her decompensation was always a possibility. In respondent’s case, the substantial doses of *770 Prolixin, namely 30 mg. per day, were only allowing respondent to function at a prepsychotic level. For Ms. N. that means that she appears free from psychotic problems, but is still án emotionally needy, very dependent person, with an immature and inadequately formed personality, making it virtually impossible for her to provide proper emotional and physical care for her children.
Dr. Abbott testified that while respondent is functioning at an optimal level presently, this is due to the large doses of medication and if she were to stop taking the prescribed dosage, she would decompensate, i.e., relapse into a psychotic condition. He also stated that every relapse increases geometrically the potential for another relapse. This is clearly a dangerous situation, and one to which three young children should not be exposed.
Dr. Abbott testified unequivocally that although the respondent was capable of providing physical care for her children, she did not have a mature attitude or feeling toward them and would be unable to give them proper nurturing.
The court is concerned, with good reason, that the stress of rearing three children might prove to be an insurmountable problem for respondent and might destroy any progress she has made.
Testimony was elicited from Ms. Deborah Epstein, a social worker from St. Joseph’s Children’s Services, with whom the children were placed. Ms. Epstein became the caseworker only recently, but has been present at several visits between respondent and her children. She has also made two home visits to respondent’s apartment on the Lower East Side, and testified that the home was adequate to accommodate the children.
Respondent called as a witness her mother-in-law Maria Mercedes N. Mrs. N. impressed the court as an honest and well-intentioned woman who stated that she would quit her job in order to help Maria every day if the children were returned. However, Mrs. N. lives in Brooklyn and the children would be residing in Manhattan.
Respondent also called her father Vicente C. Mr. C. lives in the same building as his daughter and stated that *771 he sees her several times a day, and will assist if the children are returned to Maria.
The natural father of the children has never appeared before the court, although testimony was given by respondent’s witnesses and respondent that he was available.
After hearing the testimony of these witnesses, the court concludes that they are well-meaning grandparents, but do not constitute viable resources for the discharge of these children.
Respondent testified on her own behalf. She stated, assuming her children were returned to her, if she got sick she would give the children to her father or mother-in-law to care for. The court has no doubt that Ms. N. was sincere in her assertion that she would do whatever the court required of her if it would help get her children returned.
It is understood that no decision made by this court is without the possibility of emotional harm to the three young children. It is this court’s duty and obligation to determine which dispositional alternative is attended by the fewest harmful effects on these children. In this case, the court finds that termination of respondent’s parental rights is in the best interests of the children. Custody and guardianship is committed to St. Joseph’s Children’s Services of the Catholic Child Care Society of the Diocese of Brooklyn and the Commissioner of Social Services. The agency and the commissioner are directed to institute adoption proceedings for all three children forthwith. These children have a right to a stable home environment. (Matter of Dennis, 94 Misc 2d 422.)
The agency is directed to report to the undersigned in writing on or before July 31,1981 regarding the adoptions of all three children.
The agency is to submit formal orders on notice with findings of fact as to each natural parent.