### In re The WARDSHIP OF B. C.

### No. 3–481 A 99.

Court of Appeals of Indiana,
Third District.

March 16, 1982.

Rehearing Denied May 1, 1982.

**20**

Solomon L. Lowenstein, Jr., Fort Wayne, for appellant.

Philip H. Larmore, Fort Wayne, for appellee.

STATON, Judge.

Suffering from a mental illness, L.C. gave her twenty month old daughter, B.C., to a couple whom she did not know while in the parking lot of a department store. Four days later, L.C. came to the Allen County Mental Health Association for assistance in finding her child, since she had lost the name and telephone number of the people to whom she had given her child. Through the assistance of the news media, B.C. was located. The Mental Health Association was unable to contact L.C. at the house at which she was staying. When L.C. had not returned to the house by 7 P.M., B.C. was placed in emergency foster care and by court order, made a temporary ward of the Department of Public Welfare (the Department).

Several times the trial court heard testimony and extended the temporary wardship of B.C. Eventually, the Department petitioned that a guardian ad litem be appointed for L.C. and that her parental rights to B.C. be terminated pursuant to IC 1978, 31–6–5–4.[1]

On appeal, L.C. raises the following issues[2]:

(1) Whether the finding of the trial court that there was a reasonable probability that the conditions which resulted in the removal of the child from the natural mother would not be remedied was supported by sufficient evidence of probative value?

(2) Whether the County Department of Public Welfare failed to provide reasonable services to L.C. to assist her in fulfilling her parental obligations?

(3) Whether the trial court erred in admitting into evidence the reports of the Department which contained hearsay?

As we reverse the trial court, we need only discuss the first issue.

■■■ Rights of parents in their natural children are fundamental rights protected by the United States Constitution. As was stated by the United States Supreme Court in *Stanley v. Illinois* (1972), 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551:

"The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), 'basic civil rights of man,' *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed.

---

1.   "[I.C.] 31–6–5–4. Termination of parent-child relationship involving delinquent child or child in need of services.—A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile court only by the attorney for the county department or the prosecutor; that person shall represent the interests of the state in all subsequent proceedings on the petition. The petition shall be entitled 'In the Matter of the Termination of the Parent-Child Relationship of _____, a child, and _____, his parent (or parents)' and must allege that:

"(1) The child has been removed from his parent for at least six [6] months under a dispositional decree;

"(2) There is a reasonable probability that the conditions that resulted in his removal will not be remedied;

"(3) Reasonable services have been offered or provided to the parent to assist him in fulfilling his parental obligations, and either he has failed to accept them or they have been ineffective;

"(4) Termination is in the best interests of the child; and

"(5) The county department has a satisfactory plan for the care and treatment of the child." (Ellipses original, brackets supplied).

2.   The issues have been reworded.

1655 (1942), and '[r]ights far more precious . . . than property rights,' *May v. Anderson*, 345 U.S. 528, 533, 73 S.Ct. 840, 843, 97 L.Ed. 1221 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska, supra*, 262 U.S. at 399, 43 S.Ct. at 626, the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma, supra*, 316 U.S., at 541, 62 S.Ct., at 1113, and the Ninth Amendment, *Griswold v. Connecticut*, 381 U.S. 479, 496, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring)."

Our legislature has stated in IC 1978, 31–6–1–1:

"It is the policy of this state and the purpose of this article:

\*     \*     \*     \*     \*     \*

"(5) To strengthen family life by assisting parents to fulfill their parental obligations; and

"(6) To remove children from their families only when it is in the child's best interest or in the best interest of public safety."

When a child is removed from its family and the parent-child relationship is terminated,

"all rights, powers, privileges, immunities, duties, and obligations (including any rights to custody, control, visitation, or support) pertaining to that relationship are permanently terminated, and the par-

ent's consent to the child's adoption is not required."

IC 1979, 31–6–5–6. To that parent, it is as if the child is dead.

Our legislature has stated that parental rights may be terminated based upon a preponderance of the evidence.[3] IC 1979, 31–6–7–13. On appeal, L.C. argues that the finding of the trial court that there was a reasonable probability that the conditions which resulted in the removal of B.C. from L.C. would not be remedied was not proven by a preponderance; therefore, L.C. argues that the finding was not supported by sufficient evidence of probative value.[4]

█     When reviewing a case in which the judge has rendered findings of fact, we will not set aside the judgment unless it is clearly erroneous. *Matter of Leckrone* (1980), Ind.App., 413 N.E.2d 977, 979. We will not weigh the evidence or assess the credibility of witnesses. *Matter of Myers* (1981), Ind.App., 417 N.E.2d 926, 930. The findings of the trial court will be accepted if they are supported by evidence of probative value. *Matter of Leckrone, supra*.[5]

L.C. argues that the condition which initially caused the removal of her child was her mental illness. She argues that the trial court could not determine whether there was a reasonable probability that the condition which caused the removal of her child would not be remedied because the trial court did not have any medical evidence concerning her mental condition.

█     The record contains much evidence of L.C.'s inability to hold a job, inability to support the child and herself, failure and refusal to cooperate with the Department and other social service agencies and the initial abandonment of the child to strangers. Normally, the trial court could look

---

**3.** The constitutionality of this evidentiary standard has not been raised on appeal.

**4.** The finding of the trial court reads:
   "(4) there is a reasonable probability that the conditions resulting in the child's removal will not be remedied, i.e., initial abandonment of the child to strangers, instability of home life, lack of job skills, inability to find and hold a job for more than brief periods, inabili-

ty to support herself and the child, failure and refusal to cooperate with the Department of Public Welfare and other social services agencies;"

**5.** "Probative value" means evidence carrying quality of proof and having fitness to induce conviction. *Hunnicutt v. Boughner* (1967), 141 Ind.App. 669, 231 N.E.2d 159, 161.

at this history and expect the pattern to continue. People normally continue to choose to act as they have in the past. Here, the record is clear that L.C.'s inabilities and failures are intertwined with her mental illness—an abnormal condition of behavior.

L.C. has been diagnosed as having schizophrenia. Psychotropic drugs have been developed to treat and control schizophrenia. They aid the patient in maintaining contact with reality. Other drugs are usually taken in conjunction with the anti-psychotic drugs to remove the side effects of the anti-psychotic drug. Different drugs produce different side effects; therefore, the physician substitutes medications and alters dosages until the optimum result is reached. *In the Matter of the N. Children* (1981), 107 Misc.2d 763, 435 N.Y.S.2d 1018, 1020.

Psychotropic drugs have the effect of restoring a person to his pre-psychotic state. If an individual had a well-integrated personality before experiencing a psychotic episode, the drugs should re-establish that integrated personality and allow functioning at pre-psychotic levels. Conversely, a person with a poorly integrated pre-psychotic personality would not have their personality re-integrated. It is therefore of vital importance to ascertain the person's condition prior to the manifestation of the mental illness. *Id.*, 435 N.Y.S.2d at 1021.

While suffering from a mental illness, L.C. had given her daughter to strangers. L.C. had been hospitalized during the temporary wardship of B.C. She was still hospitalized at the conclusion of the evidentiary hearings. There was no evidence before the court concerning the results that could be expected from L.C.'s hospitalization. Nor was there evidence to establish if L.C. had a well integrated pre-psychotic personality or a poorly integrated pre-psychotic personality. Apparently, L.C. exhibits more stable behavior while hospitalized. Perhaps L.C.'s more stable behavior will continue so that her mental illness and behavior problems can be considered as being cured. Perhaps not. Neither this Court nor the trial court may make a guess.

There must be some probative evidence before the court which (1) establishes the results that can be expected from L.C.'s hospitalization and (2) attempts to separate L.C.'s inabilities from her mental illness so that it may be determined (a) if L.C. has a well integrated pre-psychotic personality or (b) if, absent her mental illness, the services of the Department would assist L.C. in fulfilling her parental obligations. Without such evidence, the trial court could not determine whether there was a reasonable possibility that the conditions which resulted in the removal of B.C. from L.C. would not be remedied.

Reversed and remanded for action not inconsistent with this opinion.

GARRARD, J., concurs.

HOFFMAN, P. J., dissents with opinion.

HOFFMAN, Presiding Judge, dissenting.

I respectfully dissent. Since all the statutory requirements were met and it was in the best interests of B.C., the trial court was correct in terminating the parental rights of L.C.

IC 1971, 31–6–5–4 (Burns 1980 Repl.) provides:

"Termination of parent-child relationship involving delinquent child or child in need of services.—A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services may be signed and filed with the juvenile court only by the attorney for the county department or the prosecutor; that person shall represent the interests of the state in all subsequent proceedings on the petition. The petition shall be entitled 'In the Matter of the Termination of the Parent-Child Relationship of _____, a child, and _____, his parent (or parents)' and must allege that:

(1) The child has been removed from his parent for at least six [6] months under a dispositional decree;

(2) There is a *reasonable probability* that the conditions that resulted in his removal will not be remedied;

(3) Reasonable services have been offered or provided to the parent to assist him in fulfilling his parental obligations, and either he has failed to accept them or they have been ineffective;

(4) Termination is in the best interests of the child; and

(5) The county department has a satisfactory plan for the care and treatment of the child." (Emphasis added.)

The majority contends that there was insufficient evidence to support the trial court's finding that there was a reasonable probability that the conditions that resulted in the removal of B.C. from L.C. would not be remedied. In essence, they contend that because the trial court did not have any medical evidence concerning L.C.'s mental condition, it could not make the proper determinations.

I disagree. The trial court as trier of fact was completely capable of determining whether there was a reasonable probability that the conditions would not be remedied without hearing evidence from any medical expert. In fact, had it heard testimony from a psychiatrist which indicated L.C.'s mental condition would be changed, the trial court could still have reached the opposite conclusion.

It was only necessary for the trial court to find that there was a *reasonable probability* that the conditions that resulted in the child's removal will not be remedied. The trial court had a period of almost two years to examine L.C.'s actions, from the time she gave her child to strangers in the department store parking lot until the time her parental rights were terminated.

There was evidence that she had been given the type of medication which the majority heralds in their opinion, yet she did not follow through with it. When a home was found for her after her release from the hospital, she stayed a few days and then left, which caused great difficulty for those trying to locate her. In order to alleviate these problems following a subsequent discharge from the hospital, L.C. was placed on medication that was given by injection every two weeks, so she would not have to depend on taking a daily dosage. She was also placed in a structured living situation, a group home. This was accomplished after some difficulty because other half-way houses refused her due to her lack of cooperation with them in the past.

While there was testimony at the October 26, 1979 hearing that L.C. was improving with the medication, that improvement must have been short-lived, because on November 7, 1979, L.C. was committed to the Richmond State Hospital.

L.C. did not follow the casework plan set up for her by the Welfare Department. In fact she would refuse to discuss it, storm out of its offices, fail to respond to its letters, and go for months without informing the Welfare Department of her whereabouts. In addition, she refused visitation with B.C.

Throughout the months that the trial court held proceedings, L.C. resided in temporary housing situations, when she was not hospitalized. Her employment was extremely sporadic. The few jobs she had lasted no more than a few days, and she contributed no financial support for her child.

The evidence before the trial court was perhaps best summarized in a statement made during cross-examination by one of the Welfare Department caseworkers who had handled this matter from the outset:

"I see nothing in her history that would indicate that she will attain any degree of stability. The only stability that I have ever seen her—in her, as far as her emotional self, is while she was hospitalized. Those times when she has not been hospitalized, she has failed to take her medication, she has failed to maintain a place to live, she has failed to maintain a job, and I see no indication that she will ever be able to do that again in the reasonably near future. I don't think there is any guarantee that once she is released from Richmond Hospital that she will even on her own volition continue with counseling. And I know for a fact, that you cannot force people outside of institutions

24

to engage in counseling, or even engage, so far as to come in for their medication—or even to take it once they have it." *Record* at 290–291.

The trial court, too, found that based upon the evidence of L.C.'s actions in the past, it was reasonably probable to assume that she would continue down the same path. In conjunction with this there was a child to consider, and it was in the best interests of that child to become eligible for adoption rather than remaining in foster homes year after year waiting for her natural mother to accomplish some degree of stability.

As the majority pointed out, the findings of a trial court will be accepted if they are supported by evidence of probative value. There was sufficient evidence to support the findings of this trial court, and the judgment should be affirmed.