**In re the WARDSHIP of B.C.**

**No. 1182S412.**

Supreme Court of Indiana.

Nov. 4, 1982.

Solomon L. Lowenstein, Jr., Fort Wayne, for appellant.

Philip H. Larmore, Adair, Perry, Beers, Mallers & Larmore, Fort Wayne, for appellee.

## ON PETITION TO TRANSFER

PIVARNIK, Justice.

This cause comes to us by Petition of the Department of Public Welfare of Allen County, Indiana, for transfer from the Third District Court of Appeals. Appeal was originally taken to review a decision of the Allen Superior Court terminating the daughter-mother relationship between B.C. and L.C., B.C.'s natural mother, and making B.C. a permanent ward of the Allen County Department of Public Welfare for all purposes. The Court of Appeals found that the Superior Court did not properly consider L.C.'s mental illness and therefore reversed that court's judgment. We find the Court of Appeals wrong in its judgment and accordingly grant transfer, vacate the opinion of the Court of Appeals, 433 N.E.2d 19, and affirm the Superior Court in all things.

On November 3, 1978, the Allen County Department of Public Welfare filed a petition requesting temporary wardship of B.C. The Department specifically sought the care, custody and control of B.C. for aid and placement. On that same day, the trial court issued an emergency order in favor of the Department making B.C. a temporary ward for aid, supervision and temporary placement. The need for this action became apparent when L.C., suffering from a mental illness, gave twenty-month-old B.C. to a couple whom she did not know while in the parking lot of a department store. Four days later, L.C. went to the Fort Wayne Mental Health Association for assistance in locating B.C. since she had lost the name and telephone number of the people to whom she had given B.C. Through the efforts of the Association and with the aid of the news media, B.C. was located. By that time, however, the Mental Health Association could not locate L.C. When L.C. did not return to the house where she had been staying by a reasonable hour, the Department of Public Welfare obtained the above described court order and placed B.C. in emergency foster care.

Several proceedings and hearings on the wardship of B.C. followed. On December 19, 1978, the Department filed a Verified Petition to Abate Mother's Visitation Rights. On January 12, 1979, a hearing was held and the trial court conditionally denied the Department's abatement request but continued B.C.'s temporary wardship for a period not to exceed ninety days. On April 16, 1979, the Department filed a progress report which was accepted by the trial court without a hearing. On August 31, 1979, the trial court held a review hearing and continued B.C.'s temporary ward-

ship for a second period not to exceed ninety days. Also on August 31, the Department filed a Petition for permanent wardship for all purposes and to terminate parental rights. Attorney Solomon L. Lowenstein, Jr., was subsequently appointed as L.C.'s guardian *ad litem*. On September 19, 1979, L.C., by counsel, filed a Request for Production of Documents directed to the Department which was approved by the trial court. On October 22, 1979, the Department filed an Amended Petition for Termination of Parent-Child Relationship, which L.C. moved to dismiss. L.C.'s motion was denied. On October 26, 1979, and again on November 9, 1979, the trial court heard evidence on the Department's Amended Petition. At the November 9 hearing, counsel informed the trial court that L.C. had been committed to the Richmond State Hospital pursuant to the trial court's order in another cause involving L.C. The trial court thereupon granted a continuance until a written evaluation could be received from the hospital, and again continued B.C.'s wardship. On January 28, 1980, the trial court concluded its hearing on the Department's Amended Petition and entered its judgment terminating L.C.'s parent-child relationship with B.C. The trial court also ordered the temporary guardianship of B.C. continued in the Department of Public Welfare subject to further order. On March 28, 1980, the trial court ordered that the parental rights of B.C.'s alleged biological father be terminated and that the Department be made B.C.'s guardian for all purposes including adoption.

This cause was tried pursuant to Ind.Code § 31-6-5-4 (Burns 1980), which provides as follows:

"A petition to terminate the parent-child relationship involving a delinquent child or a child in need of services... must allege that:

(1) The child has been removed from his parent for at least six [6] months under a dispositional decree;

(2) There is a reasonable probability that the conditions that resulted in his removal will not be remedied;

(3) Reasonable services have been offered or provided to the parent to assist him in fulfilling his parental obligations, and either he has failed to accept them or they have been ineffective;

(4) Termination is in the best interests of the child; and

(5) The county department has a satisfactory plan for the care and treatment of the child."

In entering its judgment, the trial court made the following findings:

"The Court now finds and orders: (1) that the child has been removed from its mother for at least six (6) months under a dispositional decree, to-wit: January 12, 1979; (2) services have been offered or provided to said mother to assist her in fulfilling her parental obligations, to-wit: counseling, medication, hospitalization, discharge planning, transportation, child visitation, attempted location of family and friends, and assistance in finding a stable home and regular employment; (3) that such service have either been refused or have been ineffective; (4) there is a reasonable probability that the conditions resulting in the child's removal will not be remedied, i.e., initial abandonment of the child to strangers, instability of home life, lack of job skills, inability to find and hold a job for more than brief periods, inability to support herself and the child, failure and refusal to cooperate with the Department of Public Welfare and other social service agencies; (5) termination is in the best interests of the child who has flourished since November 3, 1978, in a foster care environment, and is entitled to a stable home and regular, reliable financial and emotional support; (6) Department of Public Welfare has a satisfactory plan for the care and treatment of the child, i.e., continued foster care and ultimate placement for adoption."

The issues presented in this appeal are: (1) whether there was sufficient evidence of probative value to support the trial court's finding that there was a reasonable probability that the conditions which resulted in the removal of B.C. from L.C. would not be

remedied; (2) whether the Allen County Department of Public Welfare failed to provide reasonable and adequate services to L.C. to assist her in fulfilling her parental obligations; and (3) whether the trial court erred by admitting into evidence certain reports of the Department of Public Welfare which contained hearsay.

## I

█ It is a well established and acknowledged rule that when we review a case in which a trial court has rendered findings of fact and conclusions of law, we will not set aside that court's judgment unless it is clearly erroneous. Furthermore, we will neither reweigh the evidence nor reassess the credibility of the witnesses. To do otherwise would be to substitute our judgment for that of the trial judge. *See generally: Matter of Miedl,* (1981) Ind., 425 N.E.2d 137, *Matter of Myers,* (1981) Ind.App., 417 N.E.2d 926, 930; *Matter of Leckrone,* (1980) Ind.App., 413 N.E.2d 977, 981.

█ The record before us shows that many governmental and charitable agencies gave or attempted to give aid to L.C. such that she might properly care for B.C. Unfortunately, L.C. either refused the proffered aid or failed to cooperate. For example, L.C. was provided medicine calculated to improve her condition but she refused or failed to take it. Provision was subsequently made to administer the medication by injection every two weeks, but L.C. failed to keep her appointments for this protocol. L.C. was placed in several group homes but was so uncooperative with the staffs of each that the homes refused to take her back. Arrangements were also made for L.C. to visit with B.C. but L.C. would not appear, or would appear extremely late. On one occasion, L.C. caused such trouble during her visitation that the police were required to remove her. L.C. ignored the casework plan established for her by the Department of Public Welfare. In fact, once she refused to discuss it, stormed out of the Department's office in anger, and then disappeared for several months without informing the Department where she

was. L.C. consistently failed to respond to the Department's letters or other communications. Her employment was extremely sporadic as she worked only a few days at each of several different jobs. L.C. never contributed financial support to B.C. As Judge Hoffman pointed out in his dissenting opinion below:

"The evidence before the trial court was perhaps best summarized in a statement made during cross-examination by one of the Welfare Department caseworkers who had handled this matter from the outset:

'I see nothing in her history that would indicate that she will attain any degree of stability. The only stability that I have ever seen her—in her, as far as her emotional self, is while she was hospitalized. Those times when she has not been hospitalized, she has failed to take her medication, she has failed to maintain a place to live, she has failed to maintain a job, and I see no indication that she will ever be able to do that again in the reasonably near future. I don't think that there is any guarantee that when she is released from Richmond Hospital that she will even on her own volition continue with counseling. And I know for a fact, that you cannot force people outside of institutions to engage in counseling, or even engage, so far as to come in for their medication—or even to take it once they have it.'"

We find no reason to reverse the trial court on the mere claim that some medical program might exist which might possibly cure L.C. The record indicates that a reasonable effort was undertaken to cure L.C. and that the medical procedures employed either failed or L.C. refused to cooperate such that she was not helped. We therefore agree with Judge Hoffman that the trier of fact, even without hearing any evidence from a medical expert, was most capable of determining whether or not there was a reasonable probability that the conditions warranting B.C.'s removal would not be remedied. In fact, even if the trial court had received testimony from a psychi-

atrist suggesting that L.C.'s mental condition could be changed, the trial court could still have reasonably reached a contradictory conclusion based on the evidence before it.

The record shows that this matter was before the Superior Court for a period of approximately two years before the court entered its judgment. We now find that the Superior Court had more than ample evidence of probative value to support its conclusion that there was a reasonable probability that the conditions which justified B.C.'s removal would not be remedied, and that it was in B.C.'s best interest to terminate L.C.'s parental authority. *Matter of Miedl, supra.* Accordingly, we hold that the Third District Court of Appeals erred in finding that the Allen Superior Court did not have sufficient evidence to support its judgment.

## II

■ L.C.'s contention that the Allen County Department of Public Welfare failed to provide reasonable services to assist her in fulfilling her parental obligations is without merit. The version of Ind.Code § 31–6–5–4 applicable in this case dictates that such services be provided or offered. Ind.Code § 31–6–5–4(3) (Burns 1980). As we have indicated above, however, L.C. was offered many services by the Department of Public Welfare and by several other social services agencies. The record specifically contains ample testimony from several witnesses that L.C. failed to cooperate in availing herself of the offered services and failed to abide by any of the plans established for her benefit. Accordingly, we find that the trial court had sufficient evidence before it to conclude as it did that reasonable services had been either provided or offered to L.C. to assist her in fulfilling her parental obligations, and that the services were either ineffective or refused by L.C.

## III

■ Finally, L.C. argues that the trial court erred by admitting State's Exhibits numbered 5 and 7 into evidence. Exhibits 5 and 7 were progress reports made by the Department of Public Welfare to the trial judge upon his order. L.C. claims that these exhibits contain hearsay and therefore should have been ruled inadmissible. L.C. specifically objects that the reports contain references to statements and conclusions made by people other than the case worker who authored the reports. Despite the significance L.C. now ascribes to this alleged error, this particular objection was not raised when these two exhibits were being considered by the trial court for admission. In fact, the only objection L.C. raised about these exhibits during trial was that these exhibits did not fall within the normal standards of pleadings to the court since they were in the form of letters addressed to the court. We will not allow a party to raise an objection before the trial court and then raise to this court a different objection which the trial judge never had the appropriate opportunity to consider. Accordingly, we find that L.C. has waived this issue. In addition, we find that the alleged hearsay statements in Exhibits 5 and 7 were largely the statements and conclusions of people who personally testified before the trial court anyway. To whatever extent the trial court erred by admitting these exhibits, we hold it was harmless error since this evidence was merely cumulative of other probative evidence before the trial court which justified the judgment it reached. We do not find any reversible error on this issue in this case.

Transfer is hereby granted, the opinion of the Third District Court of Appeals is vacated and the Allen Superior Court is affirmed in all things.

GIVAN, C.J., and PRENTICE, J., concur.

HUNTER, J., dissents with separate opinion in which DeBRULER, J., concurs.

HUNTER, Justice, dissenting.

I must respectfully dissent from the majority opinion. The opinion and decision of the Court of Appeals, which may be found at *In re Wardship of B.C.,* (1982) Ind.App., 433 N.E.2d 19 (Hoffman, P.J., dissenting), should not be disturbed.

As the Court of Appeals acknowledged, the catalyst for the initial removal of B.C. from the care and custody of her natural mother, L.C., was L.C.'s mental illness—schizophrenia. Her mental condition was inextricably intertwined with the behavior detailed in the majority opinion, from her act of giving B.C. to strangers in a parking lot to her inability to hold a job and her failure to cooperate with the social service agencies involved in the attempts to help her. Evidence was introduced that via medication, L.C.'s mental health was improving during the period of temporary wardship. Prior to the hearing on the petition to terminate her parent-child relationship, however, L.C. was committed to Richmond State Mental Hospital for treatment.

It may be that "there is a reasonable probability" that L.C.'s mental illness—the condition which prompted the removal of B.C. from her custody—"will not be remedied." Ind.Code § 31–6–5–4(2) (Burns 1980). Her pattern of conduct between the time B.C. was removed from her custody and the hearing to terminate her parental rights certainly is not encouraging in that respect.

As the Court of Appeals explained, however, L.C.'s behavioral history is not a conclusive basis for determining that her mental condition will not be remedied:

"Normally, the trial court could look at this history and expect the pattern to continue. People normally continue to choose to act as they have in the past. Here, the record is clear that L.C.'s inabilities and failures are intertwined with her mental illness—an abnormal condition of behavior.

"L.C. has been diagnosed as having schizophrenia. Psychotropic drugs have been developed to treat and control schizophrenia. They aid the patient in maintaining contact with reality. Other drugs are usually taken in conjunction with the anti-psychotic drugs to remove the side effects of the anti-psychotic drug. Different drugs produce different side effects; therefore, the physician substitutes medications and alters dosages until the optimum result is reached. *In the Matter of the N. Children* (1981), 107 Misc.2d 763, 435 N.Y.S.2d 1018, 1020.

"Psychotropic drugs have the effect of restoring a person to his pre-psychotic state. If an individual had a well-integrated personality before experiencing a psychotic episode, the drugs should re-establish that integrated personality and allow functioning at pre-psychotic levels. Conversely, a person with a poorly integrated pre-psychotic personality would not have their personality re-integrated. It is therefore of vital importance to ascertain the person's condition prior to the manifestation of the mental illness. *Id.,* 435 N.Y.S.2d at 1021."

*Id.,* Ind.App., 433 N.E.2d at 21–22.

Given that L.C.'s behavior was the product of her schizophrenia, the Court of Appeals' conclusion that medical evidence was both appropriate and necessary is a sound one. That evidence is the only vehicle by which to truly determine whether there is a "reasonable probability that the conditions which resulted in his [B.C.'s] removal will not be remedied," as is required by Ind. Code § 31–6–5–4(2), *supra.*

To be sure, as the majority of this Court asserts, the trial court might still reach the conclusion that L.C.'s parental rights should be terminated after it received medical evidence regarding L.C.'s mental condition and the possible future courses it might take. It does not follow, however, that expert medical evidence of L.C.'s present and future mental health is not relevant to the question. Obviously, the contrary is true; the evidence is highly relevant. Ind.Code § 31–6–5–4(2), *supra.* And so it follows that, as the Court of Appeals held, the cause should be remanded to the trial court for further proceedings "not inconsistent" with its opinion. *In re Wardship of B.C., supra,* Ind.App., 433 N.E.2d at 22. If the Court of Appeals' decision was permitted to stand, the trial court could assess any medical evidence which is presented, together with the evidence already presented, and reach a decision based on all the relevant evidence necessary to an informed resolution of the dispute.

That approach would be particularly prudent here, for as the Court of Appeals recognized, the rights of parents in their natural children are among the most basic and fundamental rights afforded citizens by our United States Constitution. U.S. Const. amend. XIV; *Stanley v. Illinois,* (1972) 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551. The United States Supreme Court emphasized the significant nature of parental rights in *Stanley v. Illinois, supra:*

> "The Court has frequently emphasized the importance of the family. The rights to conceive and to raise one's children have been deemed 'essential,' *Meyer v. Nebraska,* 262 U.S. 390, 399, 67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446 (1923), 'basic civil rights of man,' *Skinner v. Oklahoma,* 316 U.S. 535, 541, 86 L.Ed. 1655, 1660, 62 S.Ct. 1110 (1942), and '[r]ights far more precious . . . than property rights,' *May v. Anderson,* 345 U.S. 528, 533, 97 L.Ed. 1221, 1226, 73 S.Ct. 840 (1953). 'It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.' *Prince v. Massachusetts,* 321 U.S. 158, 166, 88 L.Ed. 645, 652, 64 S.Ct. 438 (1944). The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer v. Nebraska,* supra, at 399, 67 L.Ed. at 1045, the Equal Protection Clause of the Fourteenth Amendment, *Skinner v. Oklahoma,* supra, at 541, 86 L.Ed. at 1660, and the Ninth Amendment, *Griswold v. Connecticut,* 381 U.S. 479, 496, 14 L.Ed.2d 510, 522, 85 S.Ct. 1678 (1965) (Goldberg, J., concurring)." Id., 405 U.S. at 651, 92 S.Ct. at 1212, 31 L.Ed.2d at 558–9, as quoted in *In re Wardship of B.C., supra,* Ind.App., 433 N.E.2d at 20–1.

Our legislature's recognition of the fundamental nature of parental rights and the significant societal role of familial ties is reflected in its enactments. *See* Ind.Code § 31–6–1–1 (Burns 1980 Repl.); Ind.Code § 31–6–4–16(d) (Burns 1980 Repl.); *see generally, Perkins v. Allen County Department of Public Welfare,* (1976) 170 Ind.App. 171, 352 N.E.2d 502.

Just as our United States Supreme Court emphasized in *Bellotti v. Baird,* (1979) 443 U.S. 622, 634, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797, 807, that the "unique role in our society of the family . . . requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children," so also should prudence and discernment mark this jurisdiction's approach to the termination of parental rights.

That is not to say that parental rights should be regarded as absolute in nature. Rather, it is to acknowledge that the termination of those rights is an extraordinary judicial determination that irrevocably breaks and ends the parent-child relationship. Ind.Code § 31–6–5–6 (Burns 1980 Repl.). Few matters which face our courts bear such fundamental consequences.

For that reason, a petition to terminate the parental rights of a mentally ill parent should not be resolved without some examination of medical evidence concerning the probabilities of whether the mental condition "will not be remedied." Ind.Code § 31–6–5–4(2), *supra.* Schizophrenia and the future course it may take in any case is not a matter which we, as judges, are equipped to evaluate;[1] parental rights are not a matter to be terminated without a complete presentation and examination of relevant evidence.

For all the foregoing reasons, I dissent. The opinion and decision of the Court of Appeals, which would have permitted a complete presentation of the evidence rele-

---

1. The majority discounts the significance of the "mere claim that some medical program might exist which might possibly cure L.C." *Majority Opinion, supra.* That treatment programs for schizophrenia do exist and, in turn, that L.C. might be cured, are obviously very relevant matters. There is no reason that medical evidence regarding L.C.'s potential for recovery should not be presented to the factfinder for his consideration and evaluation.

vant to Ind.Code § 31–6–5–4(2), *supra,* should not have been disturbed.

I dissent.

DeBRULER, J., concurs.