## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 04 2020, 6:19 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Larry D. Stassin
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

A.T., Je.T., and Jo.T. (Minor Children) and

 J.T. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

May 4, 2020

Court of Appeals Case No. 19A-JT-2586

Appeal from the Lake Superior Court Juvenile Division

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause Nos. 45D06-1902-JT-36, 45D06-1902-JT-37, 45D06-1902-JT-38

**Altice, Judge.**

# Case Summary

J.T. (Father) appeals the termination of his parental rights with respect to his minor children, A.T. (born June 16, 2011), Je.T. (born January 19, 2013), and Jo.T. (born September 2, 2016). He claims that the judgment must be set aside because the trial court's determination that the conditions that led to the children's removal would not be remedied was clearly erroneous, and the evidence failed to demonstrate that terminating his parental rights was in the children's best interest.

We affirm.

# Facts and Procedural History

In August 2016, the Indiana Department of Child Services (DCS) received reports that five-year-old A.T. and three-year-old Je.T. and their two older siblings were dirty and unkempt, and that Mother and Father (collectively, the parents) had not enrolled the older children in school. There were also allegations that the home was filthy and in a deplorable condition. As a result of these reports, DCS Family Case Manager Rebecca Ramone went to the Lake County residence on August 12, 2016 to speak with the parents.

When Ramone arrived, she noticed an open well in the side yard. All four children were dirty and two of them were in soiled diapers. Ramone observed

holes in the floors, ceilings, and walls of the residence, and clutter throughout. There was a broken window in the home, and Ramone noticed that the kitchen plumbing was leaking. There was only plywood on the floors in the living room. The parents' bedroom contained a litter box that was overflowing with cat feces. Ramone also discovered the body of a decomposing dog in the basement.

[5] There was very little food in the house, and Father told Ramone that he was unable to clean the residence because of an alleged medical condition that he did not disclose. Father explained that he had mental health issues and Ramone saw some medications on a nightstand that were within the children's reach. Father also told Ramone that the residence was "on the condemned list" and that he had agreed with the landlord to clean the property and "bring it up to code" in exchange for rent. *Transcript* at 26, 31.

[6] The children were removed from the household and placed in protective custody following Ramone's visit.[1] Mother—who was eight months pregnant—remained at the residence with Father. On August 16, 2016, DCS filed petitions alleging that the children were in need of services (CHINS). DCS developed a plan for the parents and recommended parenting assessments,

---

[1] DCS also removed two older siblings from the residence, K.T. (born December 27, 2001) and B.J.T. (born July 3, 2007) and filed CHINS petitions for them as well. Father is the father of KT. and B.J.T., but Mother is not their mother. This appeal only concerns children A.T., Je.T, and Jo.T.

random drug and alcohol screens, home-based casework services, and supervised visitation with the children.

[7] On September 2, 2016, Mother gave birth to Jo.T., who was subsequently removed from the residence on November 9, 2016, because the parents continued to reside in the house that had been condemned and no improvements had been made to the property. DCS filed a CHINS petition with respect to Jo.T. the next day.

[8] At some point, case manager Xavia Collins visited the residence and observed that there was no stove in the kitchen, a broken toilet in the bathroom, and clutter throughout the residence and the garage. There was no running water in the house and no mattresses for the children. Father told Collins that he worked three jobs, but Collins was never able to verify Father's employment. Father also stated that he suffered from depression and ADHD but he did not always take his prescribed medications because they made him feel badly.

[9] The children were adjudicated CHINS on May 2, 2017. That same day, the trial court ordered both parents to undergo clinical and parenting assessments, home-based casework services, supervised visitation, and random drug screens. Father was also ordered to participate in and complete further counseling and therapy recommendations.

[10] The parents initially participated in DCS services and the children were returned to the residence on a trial basis in June 2017 after it was determined that some of conditions in the home had improved. However, the children

were removed again in September 2017 because they were dirty, unkempt, and had lice, and the residence remained on the condemned list. Father became hostile and aggressive, and the police had to separate Father and the DCS caseworker during the removal process.

[11] Father failed to complete the home-based casework that would have assisted him with budgeting and finding appropriate housing, employment, and community resources. Mother rarely attended therapy sessions and she eventually became totally non-compliant. She had substance abuse and mental health issues and suffered emotional and physical abuse by Father. Mother was never able to achieve sobriety, and she admitted to using methamphetamine since she was twelve years old. A therapist believed that Mother would not commit to therapy or make herself available for DCS services. Mother's visitations with the children were stopped in September 2018 due to her lack of compliance with scheduled visits.

[12] Although Father was offered services in an attempt at reunification with the children, he consistently resisted the various service providers and case managers. Even though Father completed the recommended assessments, he often became angry with the providers and case manager, and the police became involved on a number of occasions. The children were fearful of Father's anger issues and while Father sporadically participated in counseling sessions, three consecutive therapists closed his case for noncompliance. It was noted that Father "exploded, verbally screamed, and stormed out of the room" during some of the family team meetings. *Transcript* at 78. Father discontinued

therapy sessions in September 2017. Father was also physically, emotionally, and sexually abusive to Mother and at some point, Mother had obtained a protective order against Father. Father was incarcerated from April 2 to April 19, 2018 for physically abusing Mother.

[13] On February 5, 2019, DCS filed a petition to terminate Mother and Father's parental rights. On September 26, 2019, the juvenile court held an evidentiary hearing on DCS's petition. The evidence showed that Father never had appropriate housing throughout the pendency of the proceedings. At the time of the termination hearing, Father was living in Illinois, had not made a rent payment for two months, and admitted that his residence would not be appropriate for the children.

[14] Various agencies facilitated visitation between the parents and the children. Those agencies ultimately discontinued services because Father was hostile, uncooperative, and he made repeated threats to the staff. One of the agencies discontinued its visitation services because of the domestic violence incident involving Mother.

[15] According to DCS caseworkers, Father made almost no progress throughout the pendency of the three-year CHINS case. At the time of the termination hearing, Father was on probation for committing intimidation against a police officer. Collins testified that DCS had exhausted all efforts with regard to Father and that Father was still unable to parent the children. Therapist Maritza Perez had worked with A.T. and Je.T. since February 2019. She

testified that both children have an unhealthy relationship with Father. A.T. had tantrums and screamed and hit and kicked others, but her behavior substantially improved after she moved into her current foster home.

[16] Perez testified that Father visited with the children only once or twice a month and exhibited inappropriate behavior during those visits. Moreover, A.T. was afraid of upsetting Father, and Je.T.'s anxiety about Father resulted in physical symptoms and behavioral issues at school.

[17] A.T. had been living in one foster home for more than a year until her placement was changed in July 2019. The first set of foster parents were not able to handle A.T.'s "outbursts." *Transcript* at 95. Jo.T. was in a separate, pre-adoptive foster home for nearly one year, but his foster parents eventually told Collins that they were afraid of Father and they no longer wished to adopt Jo. T.

[18] A.T. and Jo.T. were subsequently placed in a foster home together on July 3, 2019, where they have remained. A.T. loves her new school and gets along well with the other foster children in the home. Je.T. has been in a foster home with her older sister K.T. since September 22, 2017. Je.T.'s foster parents are meeting her needs, and she is enrolled in extracurricular activities.

[19] Collins testified that adoption was in the children's best interests because Father did not have appropriate housing, and the foster parents in both homes provided nurturing homes and stable environments for the children. Collins

added that the children were thriving in their foster homes and that both sets of foster parents planned to adopt the children in their care.

[20] On October 3, 2019, the trial court entered the following order terminating the parental rights of both Father and Mother:

> There is a reasonable probability that the conditions resulting in the removal of the children from the parents' home will not be remedied in that: The Department of Child Services became involved with the family due to deplorable home conditions. The investigation confirmed the home to be unsuitable. The home was observed to have numerous holes in the floors, ceilings and walls. The kitchen sink was leaking and had a bucket under it. There were numerous flies throughout the home. The children's mattresses were stacked in the rooms. There were multiple animals in the home with feces throughout. The basement was full of water and the home contained strong odor. There was an open well in the backyard of the residence that was a danger to the children. The children had poison ivy and severe lice. The children were dirty and the youngest child was in a soiled diaper. . . . The . . . home was on the condemn list for the city.
>
> . . .
>
> Neither parent is providing any emotional or financial support for the child[ren]. Neither parent is in a position to properly parent these children. The children are . . . extremely bonded and thriving in their placement.
>
> . . .
>
> After numerous attempts at reunification, the children remain outside of the parents' care. The original allegations of neglect have not been remedied by the parents. Neither of these parents

have demonstrated an ability to independently parent the children and provide the necessary care, support and supervision. There is no basis for assuming the parents will complete the necessary services and find one or both of themselves in a position to receive the children back into the home. For over three years, the parents failed to utilize the available services and make the necessary efforts to remedy the conditions, which led to intervention by DCS and the Court.

. . .

The children continue to reside in a stable foster home which has indicated both a willingness and ability to adopt all the children. It would be unfair to the children to delay such permanency on the very remote likelihood of the parents committing to and completing services.

The Court finds that after three years, in these cases, [the children] certainly have a right to permanency.

There is a reasonable probability that the continuation of the parent—child relationship poses a threat to the well-being of the children in that: for the reasons stated above. Additionally, the children deserve a loving, caring, safe, stable and drug free home.

It is in the best interest of the children . . . that the parent-child relationship between the children and his [sic] parents be forever fully and absolutely terminated.

The Indiana Department of Child Services has a satisfactory plan for the care and treatment of the children which is Adoption.

*Appendix Vol. II* at 22-24. Father now appeals.[2]

# Discussion and Decision

## I. Standard of Review

When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. Indiana Trial Rule 52(A).

The trial court is required to "enter findings of fact that support the entry of the conclusions" terminating "the parent-child relationship." Ind. Code § 31-35-2-8(a), (c). When the trial court enters findings of fact and conclusions in terminating parental rights, we apply a two-tiered standard of review when reviewing that determination. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *I.A.,* 934 N.E.2d at 1132. We will set aside the trial court's judgment only if it is clearly erroneous. *In re B.C.*, 441 N.E.2d 208, 211 (Ind. 1982). A judgment is "clearly erroneous if the findings do not support the trial

---

[2] Although Mother had appeared at the initial hearing and the trial court appointed counsel for her, she never met with counsel and failed to appear at the termination hearing. She is not a party in this appeal.

court's conclusions or the conclusions do not support the judgment." *I.A.*, 934 N.E.2d at 1132.

[23] We note that the Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Meyer v. Neb.,* 262 U.S. 390, 399 (1923). A parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville,* 530 U.S. 57, 65 (2000). Indeed, the parent-child relationship is "one of the most valued relationships in our culture." *Neal v. DeKalb Cnty. Div. of Family & Children,* 796 N.E.2d 280, 285 (Ind. 2003). We recognize of course that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *In re D.D.,* 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied.* Thus, "[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities." *Id.* at 265.

[24] I.C. § 31-35-2-4(b)(2) requires that a petition to terminate a parent-child relationship involving a child in need of services must allege that:

> (A) one (1) of the following exists:
>
> > (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> >
> > (ii) a court has entered a finding . . . that reasonable efforts for family preservation or reunification are not required,

> including a description of the court's finding, the date of
> the finding, and the manner in which the finding was
> made; or
>
> (iii) the child has been removed from the parent and has
> been under the supervision of a county office of family and
> children for at least fifteen (15) months of the most recent
> twenty-two (22) months;
>
> (B) there is a reasonable probability that:
>
> (i) the conditions that resulted in the child's removal or the
> reasons for placement outside the home of the parents will
> not be remedied; or
>
> (ii) the continuation of the parent-child relationship poses
> a threat to the well-being of the child;
>
> (C) termination is in the best interests of the child; and
>
> (D) there is a satisfactory plan for the care and treatment of the child.

DCS bears the burden of proving these allegations by clear and convincing evidence. *Egly v. Blackford Cnty. Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1234 (Ind. 1992).

## II.  Father's Claims

### A.  The Children's Removal

Father claims that the trial court erred in granting the termination of parental rights because DCS failed to prove that there is a reasonable probability that the

conditions regarding the children's removal from the parents' home will not be remedied. In reviewing such a determination, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, a parent's fitness is judged as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include a parent's criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*.

[27] DCS is not required to rule out all possibilities of change; rather, it must establish that there is a reasonable probability that the parent's behavior will not change. *In re B.J.,* 879 N.E.2d 7, 18-19 (Ind. Ct. App. 2008), *trans. denied*. We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of future behavior. *Id.*

[28] In this case, the reasons for the children's initial removal from the residence were the deplorable, unsanitary, and dangerous conditions of the home, along

with the dirty and unkempt conditions of the children. The residence was on the condemned list and was set to be demolished. In addition to the structural defects, animal odor was prevalent in the residence and there was the body of a decomposed dog in the basement. There was medication within the children's reach, a minimal amount of food in the household, and no stove. Although Father told Collins that he worked three jobs, DCS was never able to verify Father's employment.

[29] Even after the children were returned on a trial basis, the parents showed no sustained improvement. As a result, the children were removed from the home again in September 2017 because the residence remained on the condemned list and the children were dirty, unkempt, and had lice.

[30] Father had been incarcerated for domestic violence against Mother, and when the children were initially removed from the residence, the police had to intervene and hold him back because he charged the caseworker. Father was also aggressive during the removal after the trial home visit, and the police had to physically separate Father and Collins. Father was uncooperative and hostile at family team meetings, and he stopped attending counseling and therapy in September 2017.

[31] The conditions that resulted in the children's removal were no different at the time of the termination hearing. Father was living in Illinois, and he admitted that the residence was not appropriate for the children. Moreover, Father had failed to pay rent for two months, and he was not meeting even a minimum

standard of cleanliness in the home. At the time of the termination hearing, Father was on probation for committing the offense of intimidation against a police officer.

[32] Collins testified that Father required continued therapy because he has not successfully dealt with his anger issues, and he poses a danger to those around him. Perez testified that A.T. and Je.T. have an unhealthy bond with Father and the visits did not go well. Moreover, the visits were only sporadic and Father saw the children only once or twice a month.

[33] In sum, Father's habitual unwillingness or inability to address his anger issues, employment and housing concerns, and his failure to participate in court-ordered services and visitations with the children all demonstrate "the requisite reasonable probability" that the reasons for the children's removal were unlikely to change. *See Lang v. Starke City OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied.* Thus, the trial court did not err in concluding that there was a reasonable probability that the conditions resulting in the children's removal will not be remedied.

### B. Best Interests of the Children

[34] Father next claims that the termination order must be set aside because the evidence does not support the trial court's conclusion that termination of the parent-child relationship is in children's best interests. When deciding whether termination of parental rights is in a child's best interests, the trial court must look beyond the factors identified by DCS and consider the totality of the

evidence. *Z.B. v. Indiana Dep't of Child Servs.,* 108 N.E.3d 895, 903 (Ind. Ct. App. 2018). In doing so, the court must subordinate the interests of the parents to those of the children involved. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* We have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S.,* 987 N.E.2d at 1158-59.

[35] In this case, DCS caseworkers and the therapist recommended termination of the parent-child relationship and adoption for the children. Collins testified that DCS had exhausted all of its efforts with regard to Father, that Father was still unable to parent the children, and that adoption was in the children's best interests. Collins further testified that Father did not have appropriate housing, was unable to maintain the housing he did have because he was behind in rent, and the current foster parents provided nurturing homes and stable environments for the children. Collins added that the children were thriving in foster care and that both sets of foster parents planned to adopt the children. Perez also testified that adoption of the children by their foster parents was in the children's best interest.

[36] These recommendations, along with the evidence demonstrating Father's lack of progress, his continuing anger issues, his lack of employment, his inability to provide adequate housing for the children, and his unwillingness to participate

in court-ordered family services, establish that termination and adoption are in the children's best interests. *See id.*; *see also Ramsey*, 707 N.E.2d 814, 818 (Ind. Ct. App. 1999). Thus, the trial court did not err in terminating Father's parental rights.

[37] Judgment affirmed.

Bailey, J. and Crone, J., concur.