**In re M.M.M., an Infant.**

**Appeal of O.M.**

**No. 82–735.**

District of Columbia Court of Appeals.

Argued April 24, 1984.

Decided Dec. 11, 1984.

Patricia A. Casey, Washington, D.C., with whom Courtenay Ellis, Marydale De-Bor, Andra Barmash Greene, and Joy L. Pritts, Washington, D.C., were on the brief, for appellant.

Christopher T. Curtis, Washington, D.C., for appellee M.M.M.

Before FERREN and TERRY, Associate Judges, and REILLY, Chief Judge, Retired.

TERRY, Associate Judge:

Appellant O.M. asks us to reverse the trial court's order terminating her parental relationship with M.M.M., her son. Finding no merit in her arguments, we affirm.

## I

M.M.M., whose paternity is unknown, was born on December 30, 1979. Less than three months later O.M. left him in the custody of the District of Columbia Department of Human Services (DHS), which placed him temporarily in St. Ann's Infant Home. He was transferred in June 1980 to the custody of Catholic Charities for placement in a foster home. In November 1980 a Superior Court judge concluded that M.M.M. was a "neglected child" within the meaning of D.C.Code § 16–2301(9)(C) (1981) and ordered him committed to the custody of the Social Rehabilitation Administration, pursuant to D.C.Code § 16–2320(a)(3) (1981). He was placed in a new foster home in September 1981, where he still resides. In January 1982, through his attorney and guardian *ad litem*, M.M.M. moved to terminate his relationship with O.M. under D.C.Code § 16–2353 (1981).

Testimony at the hearing on the motion revealed that O.M. had been confined at Saint Elizabeths Hospital for treatment of mental illness on eight different occasions between 1975 and 1981. Dr. Gary Soverow, a psychiatrist who treated her for three months in 1979, testified that she suffered from paranoid schizophrenia and occasionally experienced psychotic episodes. Her illness, which he characterized as chronic, impaired her ability to care for herself or her child. At best, with medication, her condition would stabilize. Even then, however, her psychotic episodes might recur; without the medication they surely would. Nevertheless, in June 1979 O.M. stopped seeing Dr. Soverow and taking the medication he had prescribed for her psychosis.

Several witnesses testified to instances of disturbed behavior by O.M. Her mother stated that she had had O.M. committed to Saint Elizabeths in 1975 after O.M. had thrown a pot of hot water on her. Dr. Soverow cited incidents in which O.M. tried to jump off a bridge, stood in a rainstorm for two hours, and walked down the middle of a street clad only in her underwear. Dr. Jeffrey Seltzer, a clinical psychologist at

Children's Hospital, testified that in July 1981 O.M. brought in her one-month-old son V.M., claiming that he had cursed at her, was possessed by demons, and had displayed homosexual tendencies. She then showed the doctor pictures of herself "where she was for the most part not wearing any clothes." Presented with an account of this incident, Dr. Soverow opined that appellant was psychotic at the time.

Dr. Horace Greene, a psychiatrist who had been treating O.M. regularly since December 1981, was somewhat more optimistic than Dr. Soverow. His diagnosis was essentially the same as Dr. Soverow's except that he also detected an affective disorder, apparently depression.[1] Dr. Greene testified that after she began to take medication which he prescribed, her condition improved; she showed fewer signs of paranoia, began to work toward completing her high school education, sought a job, and found permanent housing. He stated that if she continued to see him and take her medication, her condition would stabilize, and that if she were counseled in parental skills, he was hopeful that O.M. would eventually be able to care for her children. But he balked at making an explicit prediction as to when, if at all, O.M. might be able to take her children back. In six months, he said, he would be more able to venture an opinion, but he could not say what that opinion would be.

Dr. Greene's optimism was blunted not only by his hesitancy, but also by his ignorance of much of O.M.'s past history. He had not inspected her medical records, and he was aware of only one of her eight confinements at Saint Elizabeths. He did not know that her mother had had her committed in 1975, nor did he know that she had previously been on medication while under Dr. Soverow's care and had relapsed after ceasing to take it. Because he had not looked at O.M.'s history prior to August 1981, when he first saw her, he was unable to determine that her illness was chronic. He acknowledged, however, that stabilization is more difficult for a chronic schizophrenic than for one who is not chronic. He was also unaware of the details of O.M.'s visits with M.M.M. in his foster home. When the court summarized for him the testimony of three social workers concerning these visits, he stated that this information "certainly would" affect his assessment of O.M.'s ability to function as a parent.

Those social workers testified that O.M.'s visits with M.M.M. were marked by bizarre, hostile, and even violent behavior on the mother's part, and great unhappiness on the son's. Each testified that M.M.M. cried whenever he first saw O.M. and throughout the visits. O.M. showed little ability to communicate with her son. She talked to him as if he were much older, telling him of her problems and asking him why he could not read and was not attending college. When he did not respond to such conversation, O.M. would become upset. On at least two occasions she attempted to force M.M.M. to eat food she had brought him, although he had just finished a meal and was not hungry. Her rare physical contact with M.M.M. reflected clumsiness and violence more than affection. More recently O.M. paid little attention to M.M.M., leaving him to entertain himself while she dealt with V.M., a son born in 1981.[2]

In contrast, the social workers testified that M.M.M. enjoyed a warm and loving relationship with his foster family, which included his brother V.M. The foster parents, whom M.M.M. addressed as "Mama"

---

1. Dr. Soverow, after reviewing a progress report which Dr. Greene had prepared in January 1982, concluded that appellant was psychotic at that time.

2. Appellant behaved in a troubling manner to others as well during her visits. Caroline Stuckey and Ora Smith, social workers from Catholic

Charities, testified that she accused them of abusing and neglecting M.M.M. Once, after provoking a fight with another visiting parent, O.M. actually summoned the police, who found M.M.M. to be unharmed. O.M. threatened Stuckey on three separate occasions.

and "Papa," wished to adopt both M.M.M. and V.M.

O.M.'s cousin testified that she had seen O.M. hug and kiss M.M.M. and heard her tell him that she loved him. The cousin admitted on cross-examination, however, that she had visited M.M.M. with O.M. only once since O.M. placed him in the care of DHS. Similarly, O.M.'s mother testified about her daughter's love for M.M.M. and her own willingness to take him in, but she acknowledged that she had not visited him since O.M. gave him up two years before.

The trial court granted the motion to terminate the parental relationship. In its findings of fact, the court said that O.M.'s paranoid schizophrenia "greatly impairs her ability to care for herself and for [M.M.M.]," and noted that Dr. Greene could not predict "when, if ever, [O.M.] could care for [M.M.M.]." It observed that "no meaningful interaction transpires between them" during their visits, whereas M.M.M. had "adjusted well and happily" to his new home. The court concluded that clear and convincing evidence established that termination of the parent-child relationship was in M.M.M.'s best interests.

## II

■ A judge may terminate a parent-child relationship when he or she "finds from the evidence presented, after giving due consideration to the interests of all parties, that the termination is in the best interests of the child." D.C.Code § 16–2353(a) (1981). This finding must be based on "clear and convincing evidence."[3] D.C. Code § 16–2359(f) (1981). In reaching it, the judge must consider four factors:

(1) the child's need for continuity of care and caretakers and for timely integration into a stable and permanent home, taking into account the differences

in the development and the concept of time of children of different ages;

(2) the physical, mental and emotional health of all individuals involved to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental and emotional needs of the child;

(3) the quality of the interaction and interrelationship of the child with his or her parent, siblings, relatives and/or caretakers, including the foster parent; and

(4) to the extent feasible, the child's opinion of his or her own best interests in the matter.

D.C.Code § 16–2353(b) (1981).

Appellant contends that the trial court failed to give her interests the "due consideration" which D.C.Code § 16–2353(a) requires, that the evidence was insufficient to warrant a finding that termination of the parent-child relationship was in M.M.M.'s best interests, and that the court's failure to continue the case *sua sponte* for six months to allow Dr. Greene to form an opinion on her ability to raise children violated her right to due process.

## III

■ Although the trial court's findings of fact and conclusions of law carefully track the four statutory factors, appellant contends that the judge failed to give her parental interests "due consideration," as section 16–2353(a) commands. The statute does not define that term, but one of its stated general purposes is to protect the constitutional rights of all parties "while ensuring that the fundamental needs of children are not subjugated to the interests of others ...." D.C.Code § 16–2351(a)(2) (1981). In light of this language, we hold that the trial court was not obliged to con-

---

**3.** This court has adopted a definition of clear and convincing evidence as that which will "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Estate of Soeder,* 7 Ohio App.2d 271, 310, 220 N.E.2d 547, 574 (1966), quoted in *District of Columbia v. Hudson,* 404 A.2d 175, 179 n. 7 (D.C.1979) (en banc).

sider O.M.'s interests in isolation from the interests of M.M.M.[4]

The emotional welfare of other persons, including the natural parent, is relevant only "to the degree that such affects the welfare of the child, the decisive consideration being the physical, mental, and emotional needs of the child ...." D.C.Code § 16–2353(b)(2) (1981). In *In re K.J.L.*, 434 A.2d 1004 (D.C.1981), this court rejected a mother's contention that the trial court had terminated her parental rights solely because she suffered from schizophrenia, in violation of her right to due process. We concluded that the court had considered the mother's illness only insofar as it affected the child: "[t]he principal focus of the trial court's concern quite properly was on [the child's] best interests." *Id.* at 1006 (citations omitted).

■■■ To be sure, a natural parent's interest in preserving the parent-child relationship is a "commanding" factor in the determination of what process is due to the natural parent in a termination proceeding. *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981); *accord, In re K.J.L., supra*, 434 A.2d at 1006. Thus it is that terminations of parental rights must be based upon clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 768–770, 102 S.Ct. 1388, 1402–1403, 71 L.Ed.2d 599 (1982). If the statute did not require

that the court consider the quality of the relationship between parent and child, D.C. Code § 16–2353(b)(3) (1981), it would surely fall short of the demands of due process.

■■■ This does not mean, however, that the trial court must balance the parent's interests against those of the child in deciding whether to terminate the parent-child relationship. The parent's interests are relevant only to the question of what process is due. What is relevant to the court's decision is the quality of the specific relationship at issue, not some generalized view of the importance of a parent's interest. The statute makes "the best interests of the child" the controlling factor in the court's decision. D.C.Code § 16–2353(a) (1981). The fact that the parent's interest in preserving the relationship may be great is not as significant as the fact that the parent may be unwilling or unable to fulfill the child's most basic needs. The trial court here took into account the quality of O.M.'s relationship with M.M.M., as the statute requires. O.M. cannot insist that, despite the court's findings on the subject, she nevertheless has an interest which should prevail over the interests of M.M.M. himself.[5]

## IV

The trial court's findings concerning appellant's mental illness and its effect on her

---

4. The statute also required the court to give "due consideration" to the interests of the foster parents and to those of V.M., the younger brother of M.M.M. There is nothing in the statute to suggest that greater weight should have been given to O.M.'s interests solely because she was M.M.M.'s natural parent.

If M.M.M. had been brought up by his mother and had been in her care and custody at the time of the hearing below, then it might arguably have been "appropriate for the court to analyze the four statutory factors spelled out in [D.C.Code] § 16–2353(b) first with respect to the natural [parent] facing rights termination." *In re K.A.*, 484 A.2d 992, 998 (D.C.1984). But O.M. relinquished custody of M.M.M. when he was less than three months old, and since that time she has never been a custodial parent. Thus we leave "for another case on another day," in this case as in *K.A.*, the question of whether a custo-

dial parent has greater rights in a termination proceeding than a non-custodial parent.

5. We reject appellant's argument that the trial court terminated her relationship with M.M.M. "without definitive evidence that [she] was unable to perform her parental role ...." Although appellant's fitness as a parent was obviously pertinent to the trial court's inquiry, the dispositive factor was the best interests of the child. *See In re K.A., supra* note 4, at 997–998; *cf. In re J.S.R.*, 374 A.2d 860, 863–864 (D.C.1977) (holding that grant of foster parents' petition for adoption over objections of natural parent, without a finding of unfitness, does not violate due process). In any event, there was considerable evidence that appellant's illness left her incapable of caring for M.M.M. within the foreseeable future. *See In re P.G.*, 452 A.2d 1183, 1184 n. 2 (D.C.1982).

relationship with M.M.M. follow clearly from the testimony. Appellant contests the legal sufficiency of much of that testimony. We find her challenges unpersuasive.

■ Appellant maintains that the testimony of Doctors Soverow and Seltzer was rendered incompetent by the length of time which had passed since their encounters with her. Dr. Soverow last saw appellant in June 1979, nearly three years before the hearing, while Dr. Seltzer met her in July 1981, about nine months before. Citing three New York termination cases, appellant contends that the trial court was not entitled to rely on their testimony. In the most pertinent of these, *In re Daniel Aaron D.*, 49 N.Y.2d 788, 403 N.E.2d 451, 426 N.Y.S.2d 729 (1980), the New York Court of Appeals held that a doctor's testimony concerning a mother's health did not constitute clear and convincing evidence of her inability to care for her child, when he had last treated her ten months before the hearing, was equivocal as to her ability to care for the child in the foreseeable future, and "could not render with assurance any positive opinion as to her present condition." *Id.* at 790, 403 N.E.2d at 452, 426 N.Y.S.2d at 730.[6]

The case at bar is distinguishable. Had Dr. Soverow been able to testify only of a transitory disorder in 1979, his testimony probably could not have sustained a finding of mental illness three years later. But he testified that appellant's illness was chronic; it was a condition which would never disappear, even with medication. His 1979 diagnosis, combined with his expert testimony on chronic paranoid schizophrenia, was sufficient to warrant a finding that appellant still suffered from it. Dr. Seltzer's testimony, as amplified by Dr. Sover-

ow, further supported this finding. Appellant offers no reason for regarding Dr. Seltzer's testimony as unprobative; she merely labels it "outdated" and leaves it at that.

Even Dr. Greene's testimony strongly supports the trial court's findings. He, too, diagnosed appellant as a paranoid schizophrenic. His failure to detect chronicity was based not on an affirmative finding, as appellant seems to contend, but rather on a failure to inquire into her medical history. Appellant contends that Dr. Greene's testimony was inconclusive with regard to her ability to care for M.M.M. The trial court found that Dr. Greene testified that in six months he would be able to express an opinion on the subject. But, as the court also found, he was unable to say what that opinion would be. While he expressed hope that appellant might one day recover to some extent, this hope could hardly be enough to counteract the overwhelming proof that she suffered from a chronic mental disease which rendered her incapable of caring for M.M.M. at any time in the foreseeable future.

■ Contrary to appellant's assertions, the vivid testimony of the social workers clearly supported the court's findings regarding appellant's relationship with M.M.M. Appellant particularly attacks the credibility of the two social workers from Catholic Charities, Stuckey and Smith. She suggests that her tense relationship with Stuckey influenced the latter's testimony. However, nothing in the record supports an inference that Stuckey was biased against appellant, and appellant's counsel did nothing to impeach her at the hearing. Appellant's brief assault on Smith's testimony seems to be based on the contention that Smith observed her and M.M.M. only inter-

---

**6.** The reason for appellant's citation of *In re Hime Y.*, 54 N.Y.2d 282, 429 N.E.2d 792, 445 N.Y.S.2d 114 (1981), is unclear. It appears that on an earlier appeal in the same case, the Court of Appeals found insufficient evidentiary support for the trial court's findings. *See id.* at 285, 429 N.E.2d at 793, 445 N.Y.S.2d at 115. But nothing in the court's opinion supports appel-

lant's description of the case. In fact, its most striking passages do much to counter appellant's own attack on the social workers' testimony. *See id.* at 287, 429 N.E.2d at 793–794, 445 N.Y.S.2d at 115–116. Appellant's citation of *In re N. Children*, 107 Misc.2d 763, 435 N.Y.S.2d 1018 (N.Y.Fam.Ct.1981), is even more puzzling.

mittently. But Smith's testimony as to what she did see was quite substantial. Moreover, she also testified that even when she was not present during appellant's visits with M.M.M., she could hear M.M.M. crying throughout the building. Thus the court could easily have concluded, as it did, that there was "no meaningful interaction ... between [O.M. and M.M.M.] during these visits."

## V

Employing the balancing test which the Supreme Court has established for ascertaining what constitutes due process, *see Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), appellant contends that the trial court's failure to grant a continuance *sua sponte* to allow Dr. Greene to form an opinion on O.M.'s ability to care for M.M.M. created a "tremendous risk of error." Thus, she concludes, in light of her "commanding" interest in the litigation, *see Lassiter, supra,* 452 U.S. at 27, 101 S.Ct. at 2160, due process required the court to await Dr. Greene's prognosis. We do not agree.

The Due Process Clause gives to a litigant the right to present evidence in opposition to a taking of his or her life, liberty, or property. *See, e.g., Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938). However, appellant cites no authority for her contention that the trial court's failure to suspend the proceedings for six months violated this right. The risk of error which she posits is based on her characterization of the testimony of Doctors Soverow and Seltzer as unprobative. She regards Dr. Greene as the only person competent to assess her ability to raise M.M.M. But if, as we have concluded, this view is incorrect, the risk of error due to the lack of a continuance was minimal. Moreover, appellant's estimate of the risk is speculative: no one, including Dr. Greene, could have said at the time of the hearing what Dr. Greene's prognosis would be six months thereafter. While he offered some hope as to her ability to raise

children, he also indicated that it might be several years before she could do so, if ever. Since he could not predict what his prognosis would be in six months, it is impossible to say that a significant risk of error existed, in light of the rest of his testimony and that of the other witnesses. Thus the failure to await further testimony from Dr. Greene could not have denied appellant due process of law.

*Affirmed.*