**S.S., Appellant,**

v.

**D.M., R.M., and J.S., Appellees.**

**No. 89–1473.**

District of Columbia Court of Appeals.

Submitted June 20, 1991.
Decided Sept. 30, 1991.

Marion E. Baurley, appointed by this court, was on the brief for appellant.

Robert E. Richardson and John Spiegel, were on the brief for appellees.

Before ROGERS, Chief Judge, and FERREN, Associate Judge, and PRYOR, Senior Judge.

ROGERS, Chief Judge:

Appellant S.S. assigns three errors by the trial judge in ordering the adoption of her six-year old son, J.S., by appellees D.M. and R.M., the child's maternal great aunt and her husband.[1] She contends that the trial judge (1) erred in permitting the child's guardian *ad litem* to perform the dual roles of attorney and witness at the show cause hearing on why the petition for adoption should not be granted, (2) erred by taking judicial notice of and relying on findings of fact in a prior neglect proceeding where the evidentiary standard was only a preponderance of the evidence, and (3) abused his discretion in concluding that terminating appellant's parental rights was necessary to provide stability for the child, thereby denying her due process by not ordering the least drastic alternative affecting her fundamental right to raise her child. We agree that the judge erred in allowing the guardian-attorney to act as attorney and witness at the hearing, but conclude that, in the absence of objection in the trial court, there was no miscarriage of justice. For the same reason, while we agree that the judge usually could not properly rely in finding a need to terminate parental rights on findings by a preponderance of the evidence in a neglect proceeding, in the absence of objection in the trial court, we conclude there was no miscarriage of justice. Finding appellant's due process contention meritless, we affirm.

---

1. The child, J.S., is also an appellee. For ease of reference, we refer only to the great aunt and her husband ("great uncle") as appellees, and refer to J.S. as "the child."

## I

The child first came to the attention of the D.C. Department of Human Services (the department) in 1985 when he was a little over two years old, when his mother, appellant, took him to the hospital for treatment of an accidental burn after the child spilled hot water on himself while eating at a lunch counter with his mother.[2] During the child's stay in the hospital, appellant's unusual behavior attracted the attention of hospital employees, who contacted the department.[3] In 1985 a neglect petition was filed, and in 1986 the child was removed from appellant's care, and placed temporarily in shelter care. He was subsequently placed in the custody of his maternal grandmother, with whom appellant lived, but removed after less than four months. At appellant's suggestion, the child was placed on July 8, 1986 with appellees, the child's maternal great aunt, D.M., and her husband, R.M., and has resided

with them ever since.[4] On June 2, 1988, appellees filed a petition to adopt the child.

The evidence showed that after the child had been with appellees for about a year friction developed between appellant and appellee great aunt, and appellant's visits with her child were shifted from appellees' home to the department.[5] Appellant's visits with her son at the department also did not always go well.[6] The child's guardian *ad litem* testified that he had accompanied appellant and her child on three visits, and that while appellant and the child enjoyed portions of their time together, the visits were sometimes marred by her angry outbursts.[7] In addition, the guardian *ad litem* described the child's progress while living with appellees,[8] observing that originally the child was withdrawn, barely speaking and walking only with difficulty, but through speech therapy and leg braces obtained by appellee great aunt, his disabilities had been eliminated.[9] The guardian's testimony also revealed that the child con-

2. The evidence was presented in response to a show cause order why the adoption of the child by appellees should not be permitted. Eight witnesses testified: two social workers, appellant and appellees, a friend of appellant, appellant's mother, and the guardian *ad litem.*

3. Examples of appellant's behavior included fighting physically with a nurse attempting to care for appellant's child, and attempting to remove her child from the hospital by force, although hospital staff insisted that he was still in need of substantial medical treatment.

4. Appellant is the niece of appellee great aunt, who is the sister of appellant's deceased father.

5. Although appellant initially visited her son frequently, friction soon developed when she refused to respect appellees' religious practices, disrupting family prayers and generally deriding religion. In addition, she visited without warning at all hours, which appellees found disruptive. Appellee great aunt also testified that, on several occasions, appellant accompanied her son to the bathroom, and that while they were alone together the child yelled for help, saying that appellant was hurting him. Appellee further testified that appellant frequently struck her child in the aunt's presence in a manner appellee believed was abusive.

6. A social worker testified that appellant had struck the child while visiting at the department, and on another occasion had to be separated from him after beginning to beat him severely, without discernable provocation. On

still another occasion, she removed him without permission from the department during a visit and took him to her home; the police retrieved the child.

7. The outbursts included racial epithets, and on one occasion a vivid description of the way in which appellant believed the child's foster parents, appellees, planned to sexually abuse him.

8. Appellee great aunt is 60 years of age. Appellee great uncle is 70 years of age and suffers from a mental illness. He is totally disabled, and spends most of his time in a veteran's hospital. Despite the great uncle's mental health problems, the trial judge found that he presented no danger to the child, and appellant does not challenge this finding on appeal.

Appellees own their own home, testified that they have adequate financial resources to care for the child, and that appellee great aunt has an endowment life insurance policy to help finance the child's education. Further, the guardian *ad litem* testified that the child will become eligible for federal benefits as a result of appellee great uncle's veteran status if the child is adopted by appellees.

9. The trial judge personally spoke with the child and found him to be "a very, very affectionate young lad, who is open, caring and bright. There is no evidence to suggest that [the child's] mental and emotional health are anything but perfectly fine." The child identified appellees as his "Mom" and "Daddy."

sidered appellees to be his parents and their home his home. The guardian *ad litem* further testified that although his original efforts had been aimed at reunification of appellant and her son, upon witnessing the child's development while he was living with appellees, he now recommended that appellees be allowed to adopt the child.

Appellant testified that she wanted to have her son returned to her. She was of the opinion that she had cooperated with the court's orders in the neglect proceeding which had directed her to see psychiatrists and that she did not need psychiatric therapy or parenting classes.[10] She explained that she did not fully trust doctors, that she was steadily employed and had always been drug free, and that she had a home for her child.[11] She also expressed frustration with the courts because the matter of her child's custody had been pending for five years, stating that she wanted the judge to make a decision about what was going to happen to her son and that if the adoption was ordered she would not interfere. She admitted hitting her child during supervised visits but claimed her conduct was justified under the circumstances, and also admitted taking her child home without out the department's permission.

The trial judge found that appellant was withholding her consent to the adoption contrary to the child's best interests.[12] Upon consideration of the statutory factors for termination of parental rights, D.C.Code § 16–2353 (1989),[13] as well as the best interests standard in adoption proceedings, D.C.Code § 16–309(b)(3) (1989),[14] and balancing the options of leaving the child in appellees' foster care, the judge concluded that adoption was in the child's best interests, and granted appellees' petition for adoption of the child, thereby terminating appellant's parental rights to her child.

II

■ Appellant contends that the trial judge erred in allowing the child's guardian *ad litem* to serve dual roles as attorney and witness at the show cause hearing on the adoption petition. By serving as a witness testifying from his personal knowledge and also acting as an attorney explaining and commenting on the evidence and examining witnesses, the guardian's credibility was enhanced in the eyes of the

---

**10.** Appellant claimed that she had been unaware that she had been described during the neglect proceeding as having a mental illness, which took the form of "generalized anxiety disorder and a schizotypo [sic] personality disorder" characterized by paranoia and avoidance features.

**11.** Appellant's distrust of doctors was based partly on her experiences following her child's accidental burn and those of her sister who was admitted to St. Elizabeths Hospital for a time. The trial judge noted that the findings in the neglect case indicated that appellant did not seek prompt medical care for the child's burns after the accident "out of fear that he would be taken from her as were three other children." Reading the transcript, it is difficult to know whether appellant's view of doctors was irrational or whether, in responding to leading questions, she was simply reaffirming her general distrust. In any event, she referred during her testimony to her concern about unnecessary unconsented-to surgery that would alter her brain or eyeballs.

**12.** Based on the finding by another judge on July 12, 1989, that the natural father could not be located, or had abandoned the child and not contributed to the child's support for at least six months prior to the filing of the adoption petition, the trial judge found that the finding was law of the case and that since the natural father cannot be located his consent is not required. D.C.Code § 16–304(d) (1989).

**13.** The judge's finding with regard to stability was based on the testimony he heard and appellant's failure to take "even small steps" to overcome her fears and reintegrate herself into the child's life, noting appellant's resistance to therapy for three years and the unlikely prospect of it in the future. Regarding physical and mental and emotional health, *see* Part III, *infra*. As to interrelationships, the judge noted appellees' success with the child and appellant's failure to develop a close relationship with the child. Finally, the judge found that the child had adjusted well with appellees and that the guardian *ad litem* "gave voice to [the child's] perceived best interests."

**14.** The trial judge recited these as the child's age, stability of the adopting family and their financial and other resources, the existence of love and affection, blood relationship, race, "and other significant factors." *See* D.C.Code § 16–309.

court, appellant maintains. She further maintains that allowing the child's attorney to testify as a fact witness violated the ethical rules prohibiting attorneys from acting as both advocates and witnesses in the same proceeding, D.C. RULES OF PROFESSIONAL CONDUCT Rule 3.7 (Supp.1991), and that these prohibitions exist precisely because of the prejudice to an opposing party that may result when the dual roles combine to enhance the attorney's credibility in the eyes of the fact-finder. Because appellant did not object at trial to the guardian *ad litem* testifying as appellees' witness, our review is limited to a determination of whether the error resulted in a "miscarriage of justice." *Scoggins v. Jude,* 419 A.2d 999, 1002 (D.C.1980); *see also President and Directors of Georgetown College v. Diavatis,* 470 A.2d 1248, 1251 (D.C.1983) (citing *Miller v. Avirom,* 127 U.S.App.D.C. 367, 384 F.2d 319 (1967)).

We first review the testimony of the guardian *ad litem,* then the statutory framework, and finally the Rules of Professional Conduct.

### A

The child's guardian *ad litem* testified, as a witness for appellees, that he was originally appointed as guardian *ad litem* for the child at the initial hearing in August 1985, when the child was at St. Anne's Receiving Home.[15] The guardian *ad litem* explained that he had viewed the child as his client but that he had also acted in "a kind of protective role for him."[16] In the opinion of the guardian *ad litem,* appellees' petition for adoption should be granted in the child's best interests. Summarizing the reasons for his opinion, the guardian *ad litem* pointed to the child's view of appellees' home as his home, the child's development while residing with appellees, and the

guardian's opinion that reunification is "not a viable goal in this case." The guardian began to explain why he had changed his mind from his original position that the mother had not neglected the child and that the child should be returned to her.

At this point the trial judge inquired of the guardian *ad litem* whether, during the neglect proceeding, he had been wearing "both your attorney hat and your guardian *ad litem* hat?" The guardian replied that since the child was only three years old at the time of the neglect proceeding, he had been acting as guardian *ad litem.* Yet in describing his conduct the guardian *ad litem* recounted that he had challenged the government's vague allegations of neglect, obtained two medical evaluations of appellant, and concluded then that as between government care and appellant's care, the child's best interests lay in being with appellant, particularly since one doctor had testified that appellant could benefit from therapy, which he was willing to provide. After the child was placed with appellees, however, the guardian *ad litem* became "a fan of Mrs. M—," appellee great aunt, once he observed "the remarkable turnaround" in the child while under her care.

Thereafter, the trial judge asked the guardian *ad litem* a series of questions about the child: his physical condition when the guardian first met him, whether the guardian's observations of the child had been continuous to the present time, whether the child's physical problems persisted at the present time and how they had been abated; about appellees: the guardian's opinion of the suitability of appellees' home for the child, their financial ability to provide for the child, the child's relationship with appellee great uncle; and about reunification: the guardian's efforts to reu-

---

15. The guardian *ad litem* testified that he is a member of the D.C. Bar and had previously served as staff attorney for the Superior Court's Office of Counsel for Child Abuse and Neglect. He was appointed to represent the child while he was in private practice. However, he continued to represent the child after he became a court employee in 1987–1989. This was the first time he had testified as a witness in a court.

16. In the latter role, the guardian *ad litem* drew a further distinction between representing the best interests of the child as he, the guardian *ad litem,* perceived them, and, where possible, representing the child's subjective desires; in the guardian's view, because of the tender age of the child throughout the relevant time period, the guardian *ad litem,* or protective role, predominated almost entirely.

nify appellant and the child, and the reason that reunification efforts ceased. Regarding reunification, the guardian *ad litem* described the three visits he had monitored between appellant and the child in late 1988 and early 1989, when appellant took umbrage at the child's view of appellees as his parents. The guardian *ad litem* also expressed his legal opinion that the termination of parental rights statute allowed for a shift in emphasis from reunification to the child's need for stability and continuity of care. On cross-examination the guardian *ad litem* described the deteriorated relationship between appellant and appellee great aunt, and admitted he was unaware of the precise nature of appellee great uncle's "mental functioning."

## B

The District of Columbia Code is not unlike the statutes in other jurisdictions which do not always clearly distinguish between the dual roles of a guardian *ad litem*.[17] Commentary in the area has identified two principal roles, which may in practice overlap, the first being that of a neutral fact-finder, and the second that of a zealous advocate.[18] As neutral fact-finder, the attorney's duties are to investigate the details of the case and to prepare a report summarizing the relevant facts for the presiding judge; as factfinder, the attorney does not recommend a particular disposition. As advocate, the attorney forms an opinion, either in consultation with the child or based on his or her own analysis, about

the disposition which would promote the child's best interests and advocates that position before the court.

The District of Columbia Code provides that "[i]n any proceeding wherein the custody of a child is in question, the court may appoint a disinterested attorney to appear on behalf of the child and represent his best interests." D.C.Code § 16–918(b) (1989). With respect to any neglect or termination of parental rights proceeding, the Code provides for the appointment of counsel for the child, D.C.Code § 16–2304(b)(1) (1989), and that:

> The Superior Court shall in every case involving a neglected child which results in a judicial proceeding, including the termination of the parent and child relationship ... appoint a guardian ad litem who is an attorney to represent the child in the proceedings. The guardian ad litem shall in general be charged with the representation of the child's best interest.

D.C.Code § 16–2304(b)(3) (1989). The legislative history indicates that this statute was designed to bring the District of Columbia Code into conformity with federal law, and that the Council of the District of Columbia contemplated an advocacy role for the guardian *ad litem:*

> Section 402 would require that a guardian *ad litem* who is an attorney be appointed for the child. Section 402 complies with the Child Abuse Prevention and Treatment Act, PL 93–247, Jan. 31,

---

**17.** *See* R. HOROWITZ & H. DAVIDSON, LEGAL RIGHTS OF CHILDREN, *Family Law Series*, § 7.17, at 298–99 (1984) ("majority of states ... provide no ... explicit guidance" on the proper roles of the attorney and guardian *ad litem* of a child).

**18.** *See* Guggenheim, *The Right to be Represented but not Heard: Reflections on Legal Representation for Children,* 59 N.Y.U.L.REV. 76, 100, 107, 138–143 (child under seven) (1984); Note, *Speaking for a Child: The Role of Independent Counsel for Minors,* 75 CALIF.L.REV. 681, 690–92 (1987) (applying substituted judgment analysis for representation of immature client).

One treatise identified at least four principal duties of an attorney appointed to represent a child in a custody or neglect case: (1) investigating the case, principally by interviewing all in-

terested parties and by observing the child interacting with these parties, (2) representing the child in court, by functioning as an attorney in calling witnesses, cross-examining them, and making opening and closing arguments, (3) developing plans for disposition of the case, such as recommendations regarding placement of the child, and (4) reducing trauma to the child, by negotiating disputes if possible and explaining the legal process to the child. HOROWITZ & DAVIDSON, *supra* note 17, at 298–99. A second treatise defines the role of the guardian in equally broad terms to include investigating the case and representing the child at trial, as well as drafting reports and testifying on the child's behalf. J. ATKINSON, MODERN CHILD CUSTODY PRACTICE, Ch. 13 (1986).

1974,[19] which requires that states have statutory provisions for the appointment of a guardian *ad litem* for the child in neglect proceedings. Given the complexities and the adversary nature of the proceedings involved in neglect litigation, your committee feels it is important that this guardian be an attorney who can function in the court and who can, in addition to advocating the child's best interests, act as the child's counsel.

Report to the Council of the District of Columbia from the Committee on the Judiciary, Title IV, Bill No. 2–48, The Prevention of Child Abuse and Neglect Act of 1977, at 16 (Mar. 29, 1977). In addition, the District of Columbia Code provides generally that the court may appoint a "guardian of the children when it appears to the court that the welfare of the children requires it." D.C.Code § 21–101(b) (1989).[20] By contrast with these statutes, which address the dual roles of a guardian *ad litem* with-

out necessarily distinguishing between the two, the District's general guardianship statute envisions only an advocacy role for the guardian *ad litem*, providing explicitly that the guardian shall not be a neutral fact-finder and that the judge must make part of the record the reason for appointing the guardian *ad litem* and the duties of guardian *ad litem*. D.C.Code § 21–2033 (1989).[21]

The statutes as well as the testimony of the guardian *ad litem* indicate that the trial court appointed a guardian *ad litem* to serve as an advocate for the child in the neglect proceeding. The guardian *ad litem* continued as an advocate, according to his testimony, almost to the time of the disposition in the neglect proceeding. D.C.Code §§ 16–918(b), –2304(b)(2) & (3). Later, while monitoring three of appellant's visits with the child, the guardian *ad litem* may have functioned more like a fact-finding guardian *ad litem*. Once the adoption

19. 42 U.S.C. §§ 5101 *et seq.* (1983 & Supp.1990); *see also* 45 C.F.R. § 1340.14(g) (1990) (states must have provisions for the appointment of a guardian *ad litem* in child abuse and neglect cases as a condition of receiving funds under the Act).

20. The rules for the Family Division of the Superior Court of the District of Columbia applicable to custody and adoption proceedings provide for the appointment of guardians and attorneys. Super.Ct.Dom.Rel.R. 17(c) & (d). The rule defines the guardian's role in general terms. Super.Ct.Dom.Rel.R. 17(c) provides:

*Infants or incompetent persons.* Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative he [or she] may sue by his [or her] next friend or by a guardian *ad litem*. The Court shall appoint a guardian *ad litem* for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.

21. D.C.Code § 21–2033 (1989) provides:

(a) At any point in a proceeding, a court may appoint a guardian ad litem to prosecute or defend the interest of individuals in any legal proceeding if the court determines that representation of the interest otherwise would be inadequate. If not precluded by a conflict of interest, a guardian ad litem may be appoint-

ed to represent several individuals or interests. In addition, a guardian ad litem may be appointed by the court to assist the subject of an intervention proceeding to determine his or her interests in regard to the guardianship or protective proceeding or to make that determination if the subject of the proceeding is unconscious or otherwise wholly incapable of determining his or her interests in that proceeding even with assistance. In either case the guardian ad litem shall not serve as an independent finder of fact, investigator, ombudsman, or other neutral party in the proceeding. The court, as a part of the record of the proceeding, shall set out its reasons for appointing a guardian ad litem and his or her specific duties.

(b) The duty of counsel for the subject of a guardianship or protective proceeding is to represent zealously that individual's legitimate interests. At a minimum, this shall include:

(1) Personal interviews with the subject of the intervention proceeding:

(2) Explaining to the subject of the intervention proceeding, in the language, mode of communication, and terms that the individual is most likely to understand, the nature and possible consequences of the proceeding, the alternatives that are available, and the rights to which the individual is entitled; and

(3) Securing and presenting evidence and testimony and offering arguments to protect the rights of the subject of the guardianship or protective proceeding and further that individual's interests.

proceeding began, D.C.Code § 16–309 (1989), however, he resumed his role as advocate. But as a witness for appellees he also appears, from the trial judge's questions about the guardian's observations of the parties, to have assumed the role of neutral factfinder from the commencement of the neglect proceeding. After completing his testimony, the guardian *ad litem* again resumed his advocacy role.

There may well be overlapping functions for a guardian *ad litem* who is appointed during a neglect proceeding when subsequent events result in either a termination of parental rights or an adoption proceeding. The definition of the precise roles of the attorney and the guardian *ad litem* for children is still evolving and not without difficulty.[22] But what happened here went beyond a mere overlapping of the dual roles of a guardian *ad litem;* the advocate guardian became a witness for one of the parties to facts and opinions on the ultimate issues. For this purpose the guardian's roles as advocate and as neutral factfinder are distinct, and the D.C. Rules on Professional Conduct make clear that there is reason to keep them separate.

### C

Rule 3.7 of the D.C. Rules on Professional Responsibility states the traditional prohibition:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) The testimony relates to an uncontested issue;

(2) The testimony relates to the nature and value of legal services rendered in the case; or

(3) Disqualification of the lawyer would work substantial hardship on the client.

RULES OF PROFESSIONAL CONDUCT Rule 3.7, District of Columbia Court Rules Annotated (Supp.1991).[23] The commentary on the rule recites the basic reason for prohibiting an attorney from being both attorney and witness, namely, to avoid conflicts that arise when an attorney puts his or her own credibility at issue in litigation. Such conflicts may prejudice the client when the attorney's testimony is impeached on cross-examination, or may prejudice the opposing party, when the attorney's testimony is given undue weight by the fact-finder as a result of his dual role.[24] *See* Comments to Rule 3.7; *see also MacArthur v. Bank of New York,* 524 F.Supp. 1205 (S.D.N.Y.1981) (rule protects both client and opposing party). Violation of the Rule 3.7 creates, in effect, a rebuttable presumption of prejudice.

Appellant argues persuasively that an attorney, as an advocate of one position, usually has an interest in the outcome and does not make legal arguments from the witness stand. When the same person acts as attorney and witness, the attorney puts his or her credibility on the line and, as an officer of the court, may well be viewed less critically than a lay witness. Appellant maintains, therefore, that the attorney's credibility is enhanced in a contested proceeding when the attorney is allowed to testify and comment on the evidence.[25]

---

**22.** The discussion in Guggenheim, *supra* note 18, and "Speaking for a Child," *supra* note 18, point out areas of uncertainty and complexity.

**23.** Rule 3.7, effective January 1, 1991, replaced the prohibition formerly contained in Disciplinary Rule 5–102(A) of the District of Columbia Code on Professional Responsibility, which provided:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he [or she] or a lawyer in his [or her] firm ought to be called as a witness on behalf of his [or her] client, he [or she] shall withdraw from the conduct of the trial and his [or her] firm, if any shall not continue representation in the trial. . . .

DR 5–102, D.C. CODE OF PROFESSIONAL RESPONSIBILITY (1990); *see also Goon v. Gee Kung Tong, Inc.,* 544 A.2d 277, 279 n. 5 (D.C.1988) (applicability of rule where attorney for party is witness).

**24.** Thus, contrary to the position of appellees and the guardian *ad litem* on appeal, the concern about potential conflicts is not limited to consideration of whether the guardian *ad litem* maintained undivided loyalty to the child when the guardian testified and when he acted as advocate for the child.

**25.** *See Bottaro v. Hatton Assoc.,* 680 F.2d 895, 897 (2d Cir., 1982) (among other purposes, the attorney-witness rule avoids "the possibility that the lawyer will enhance his or her credibility as

Further, because of the presumption that a guardian *ad litem* acts solely in the best interests of the child, appellant maintains that the testimony of a guardian *ad litem* is likely to be given even greater credibility by the trier of fact since the guardian *ad litem* is viewed as an unbiased witness without a stake in the litigation in the same sense as an attorney for a party to an adversary proceeding.

Specifically, appellant contends that she was prejudiced precisely because the guardian's testimony was accorded the type of undue weight which the attorney-witness prohibitions were designed to avoid. She observes that the trial judge described the guardian as "[giving] voice to [the child's] perceived best interests," thereby presenting her with "the difficult dilemma of having to argue against his credibility." Her position was made even more difficult, she continues, by the substance of the guardian's testimony in which he indicated that he originally supported reunification between the mother and child, but changed his view when he observed the progress of the child under appellees' care. Furthermore, during closing arguments, the guardian *ad litem* stated to the trial judge, "You have heard my testimony," thereby as attorney relying on his evidence as a witness.

■ The issues on which the guardian *ad litem* testified were clearly in dispute and went to the heart of the adoption proceeding. Not only did he describe his personal observations, he offered lay opinions on the best interests of the child and the likelihood of reunification. Accordingly, because the guardian *ad litem*, who had been appointed as an advocate for the child, was called as a witness for one of the opposing parties, new counsel should have been appointed to represent the child.[26] The circumstances suggest no substantial hardship to the child; while the guardian *ad litem* had probably established a relationship with the child, the child was very young and another lawyer could still serve effectively as an advocate for the child in the adoption proceeding. The question remains whether there was a miscarriage of justice.

Other than the guardian's opinion testimony, his testimony was largely cumulative or undisputed by appellant. Social workers recounted appellant's behavior during visits with the child at the department and appellee great aunt offered evidence about appellant's behavior during visits with the child at appellees' home. The court orders entered in the neglect proceeding, moreover, substantiated the testimony of the guardian *ad litem* about the mother's refusal to enter into therapy

---

an advocate by virtue of having taken an oath as a witness") (citation omitted); *Ford v. State*, 628 S.W.2d 340, 344 (Ark.Ct.App.1982) (Corbin, J. dissenting).

**26.** *District v. Oldtown Preservation Soc'y, Ltd.* 115 Daily Wash.L.Rptr. 844 (Super.Ct.1987) (withdrawal of the attorney is mandatory under DR 5–102(A) of D.C.Code on Prof. Resp. where apparent that attorney "ought" to be called as a witness); *see Council for the Nat'l Register of Health Serv. Providers in Psychology v. Am. Home Assur. Co.*, 632 F.Supp. 144, 147 (D.D.C.1985) (disqualification mandatory under ABA Code of Prof. Resp. DR 5–102(A) where attorney's testimony is necessary; if not, court has discretion to allow client to waive application of the disqualification rule) (citing *Groper v. Taft*, 230 U.S.App.D.C. 358, 361, 717 F.2d 1415, 1418 (1983) (disqualification was proper where it became clear that attorney who had represented both a closely-held corporation and one of its officers in her individual capacity ought to be called as a witness in litigation to

dissolve the corporation)). *See also Rosen v. NLRB*, 236 U.S.App.D.C. 298, 308, 735 F.2d 564, 574–75 (1984) (no waiver possible where attorney was only individual capable of rebutting arguments made by witnesses for the opposing party); *In re Guardianship of Sim*, 225 Neb. 181, 205, 403 N.W.2d 721, 737 (1987) (possibility of ethical violation where same person was both attorney and guardian for an Alzheimer's patient and testified regarding substantive matters); *Dell v. Dell*, No. L–86–133, 1986 WL 15064 (Ohio Ct.App. Dec. 31, 1986) (where direct conflict between child's desires regarding custody and guardian's testimony regarding the child's best interests, DR 5–102 requires appointment of separate counsel to represent the child) (citing *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232, 479 N.E.2d 257, 260 (1985) (where conflict between attorney's roles as guardian and advocate, attorney should petition court to allow withdrawal as guardian)). We need not and do not decide whether there was a conflict of interests or a violation of the Rules of Professional Responsibility.

and attend parenting classes. *See* Part III, *infra.* Appellant admitted that she had not participated in therapy and parenting classes, and did not deny that the child had made significant progress while living with appellees; rather she claimed she was not mentally ill and that her conduct, which others described as bizarre, was justified under the circumstances as she described them. Nor did she dispute the guardian's testimony about her conduct during the three monitored visits. In addition, the child confirmed for the trial judge that he viewed appellees as his parents, and his expression about his relationship to appellees partially confirmed the testimony of the guardian *ad litem* about appellant's conduct during the monitored visits. Moreover, on cross examination, the guardian *ad litem* admitted that he was uninformed about appellee great uncle's mental condition and had become a "fan" of appellee great aunt, indicating both the limitations of his direct knowledge of relevant facts and his bias.

This also is not the typical case in which one party is seeking, by calling the attorney for the opposing party, to gain a tactical advantage.[27] Strictly speaking, the child was not a party in the usual adversarial sense. Furthermore, much of the testimony of the guardian *ad litem* involved his personal observations, as distinct from conversations with third parties, and he was subject to cross examination.[28]

What is more difficult to assess is whether the lay opinion testimony of the guardi-

an *ad litem* on the ultimate issues in the case was enhanced in the eyes of the trial judge because he had served as advocate for the child for several years and was familiar with what had happened since the child was first brought to the attention of the court.[29] The opinions of the guardian *ad litem* were potentially very prejudicial to appellant, as she contends, precisely because he began representing the child's best interests as an advocate, challenging the government's allegations of neglect and seeking reunification of the child and appellant, and had changed his mind about the child's best interest after witnessing the child's development with appellees and appellant's inappropriate behavior when she was with the child. In describing the monitored visits the guardian *ad litem* provided devastating insights of appellant and her relationship with the child. The trial judge specifically found that the testimony of the guardian *ad litem* with respect to his opinion that the adoption was in the child's best interest was "credible."

However, the findings of the trial judge make clear that the judge did not uncritically adopt the lay opinions of the guardian *ad litem.* While crediting the testimony of the guardian *ad litem*, the findings of fact and conclusions of law make clear that the judge independently evaluated the evidence, weighed the options for the child, and reached his own conclusion that the adoption was in the child's best interests. *See, e.g., In re S.G.,* 581 A.2d 771, 776 (D.C.1990) (as trier-of-fact judge is pre-

---

27. *See MacArthur v. Bank of New York, supra,* 524 F.Supp. at 1208 (describing tactical advantages and disadvantages where attorney and witness roles overlap).

28. HOROWITZ & DAVIDSON, LEGAL RIGHTS OF CHILDREN, *supra* note 18, § 7.17, at 715 (primary difficulty with guardian *ad litem* testifying is where guardian's testimony is principally based on hearsay); *see Howard v. Howard,* 124 N.H. 267, 469 A.2d 1318 (1983) (guardian's testimony, based on interviews with individuals familiar with the child, was not excludable hearsay and parent's right to confront witnesses was not denied where guardian was available for cross-examination).

29. While modern rules of evidence allow lay opinion based on personal observations which is helpful to the trier of fact, *see Fateh v. Rich,*

481 A.2d 464, 470 (D.C.1984) (citing McCORMICK's HANDBOOK ON THE LAW OF EVIDENCE § 11, at 28 (3d ed. 1984)); *cf. Butler v. United States,* 322 A.2d 279, 280 (D.C.1974) (per curiam) (error to admit lay opinion regarding defendant's intent), the issue is whether the weight given to the guardian's opinions was impermissibly enhanced by the guardian's dual role. *See* Guggenheim, *supra* note 18, at 102 ("Allowing the attorney to testify about what he believes to be the appropriate outcome in the case encourages the factfinder to abdicate its responsibilities to the lawyer," noting one study in which attorneys were of the view that in contested proceedings the judge relied heavily on their investigation and recommendation).

sumed to separate admissible from inadmissible evidence and to rely only on competent evidence) (citation omitted). The judge reviewed the evidence presented at the hearing at length in his factual findings. He noted that the guardian's opinion was joined by the adoption social worker, who had interviewed the parties and conducted a home study of appellees that included their physical and mental health and financial background; the judge found her testimony "forthright, credible and consistent with her written report." In reviewing the statutory factors, *see* notes 13 & 14, *supra*, the judge examined the advantages and disadvantages to the child of maintaining the status quo, in order to allow appellant to "overcome her fears, some of which may be justified, and reintegrate herself into [the child's] life." He rejected the status quo option since the record was "devoid of any affirmative progress reports or even small steps in that direction [by appellant] despite [the neglect judge's] six separate firm orders to [appellant] ... that she engage in therapy as a condition to evaluate her ability to regain custody of [the child]." In the judge's view:

> allow[ing] the child to remain in an unsettled status in the unlikely hope that his mother who has resisted mental health intervention for three years would do a turn about ... is simply an unrealistic notion particularly in view of the lack of any progress in treatment history. To delay making a decision for [the child] now—in the hope that [appellant] will improve at some unknown time in the future—would not be in his best interest since he needs stability now.

He contrasted the status quo option with the child's development and integration into appellees' home and lives, and examined the child's best interests, noting not only his past development with appellees but his present attitude toward them and their ability to provide a "permanent, stable and loving home" now. In sum, the judge's findings and conclusions did not emphasize evidence that was only offered by the guardian *ad litem*, but made an informed, independent judgment based on the entire record regarding the child's best interests. Furthermore, appellant's counsel had the opportunity to object to the guardian *ad litem* appearing as a witness and did not. We conclude there was not a miscarriage of justice.

### III

■ Appellant's second claim of error relates to the taking of judicial notice and reliance by the trial judge on factual findings and conclusions of law in the initial neglect proceeding in this case. Appellant objects because the standard of proof in a neglect proceeding is a preponderance of the evidence, while the standard of proof in a termination of parental rights is clear and convincing evidence. As a result, appellant contends that the judge's conclusion that adoption was in the child's best interest, based on facts developed at the neglect proceeding, was not supported by clear and convincing evidence. This issue is raised for the first time on appeal.

■ In general, a judge may take judicial notice of the contents of court records. *See Mannan v. District of Columbia Board of Medicine*, 558 A.2d 329, 338 (D.C.1989) (quoting 21 C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE AND PROCEDURE, § 5106 at 505 (1977)); McCORMICK'S HANDBOOK ON THE LAW OF EVIDENCE, *supra* note 29, § 330 at 927. But, as a general rule, courts will not judicially notice records and facts in one proceeding in deciding another proceeding. *In re Adoption of K*, 417 S.W.2d 702, 704 (Mo.Ct.App.1967) (in general, party entitled to have merits of case reviewed on evidence lawfully introduced at party's trial) (citations omitted). There are exceptions, *id.*, and in appropriate cases, a judge may take judicial notice of the contents of court records in a related prior proceeding. *See Fletcher v. Evening Star Newspaper Co.*, 77 U.S.App.D.C. 99, 133 F.2d 395 (1942) (per curiam) (court may take judicial notice of its own records and "of other cases including the same subject matter or questions of a related nature between the same parties"), *cert. denied*, 319 U.S. 755, 63 S.Ct. 1163, 87 L.Ed. 1708 (1943); *Washington Mobilization Comm. v. Cullinane*, 400 F.Supp. 186, 202

(D.D.C.1975) (judicial notice of findings of fact and proceedings in other federal cases arising out of same protests and challenging same police activity), *rev'd on other grounds*, 184 U.S.App.D.C. 215, 566 F.2d 107 (1977); *Hipp v. Hipp*, 191 F.Supp. 299, 302 (D.D.C.1960) (in action to partition property, judicial notice of award of alimony and personal property in case in another court between same parties), *aff'd* 111 U.S.App.D.C. 307, 296 F.2d 429 (1961) (per curiam); *see also In re Adoption of K, supra*, 417 S.W.2d at 704–05 (on appeal from adoption proceeding, appellate court takes judicial notice of prior appeal to determine if mother's conduct over period constitutes abandonment, even though prior appeal did not involve same parties or same issues).

In the instant case, the neglect proceeding was consolidated with the hearing on the petition for adoption, according to the trial judge, "so that [appellant's] court appointed counsel in the neglect action [could] appear and represent her in the adoption action." On the date the parties appeared before the trial judge for the show cause hearing, the judge advised counsel that he had reviewed "the file" and was "aware of the procedural history of the case and who the petitioners are, the background, the mother's involvement, the guardian *ad litem*, the visitation, the reports between the guardian to [the judge in the neglect proceeding] in terms of visitation between the child and the mother." [sic] On the second day of the proceedings, counsel for appellees requested that the trial judge take judicial notice of the order finding neglect entered by the judge in the neglect proceeding and "all orders in the Court jacket from the initial shelter case order through all of the subsequent review orders that are in the [neglect] jacket." In response to the trial judge's inquiry whether there was any objection to his "taking judicial notice of all the appropriate orders of the finding of neglect ... and the subsequent review orders," appellant's counsel advised that he had no objection. The judge thereupon stated that he would "take judicial notice of the file of the case to that extent." In addition, prior to closing arguments, the guardian *ad litem* stated that he would not offer any more evidence in view of the judge's decision to take judicial notice of the orders and findings of fact and conclusions of law in the neglect proceeding.

On appeal, appellant contends that the trial judge went beyond taking judicial notice of orders in the neglect proceeding and also relied on the allegations in the neglect petition and factual findings and conclusions of law in the neglect proceeding with respect to five matters about which no evidence was offered in the instant consolidated proceeding: (1) that appellant was unable to discharge her parental responsibilities because of her mental illness, (2) that her mental illness had been diagnosed as a paranoid disorder "with the diagnostic impression of paranoid schizophrenia," (3) that she had attempted to remove the child from the hospital against medical advice, (4) that she has auditory hallucinations and persecutory delusions and has threatened to kill the child and others if people tried to take him away from her, and (5) that the "underlying conditions that gave rise to the original diagnosis are either still present or have not abated sufficiently." [30]

In stating that he would take notice of orders in the neglect case, the trial judge

---

30. The judge found that appellant had refused to cooperate with the social worker in providing a history of her mental treatment, if any, in response to the neglect judge's orders. "Of great importance to the court is the fact that [appellant] did not present any expert testimony at this proceeding that would suggest that her mental illness as found by the court in 1986 had in any way changed either in a positive or negative manner." From this, and the absence of any reports showing treatment, the judge concluded that "the underlying conditions that gave raise [sic] to the original diagnosis are either still present or have not abated sufficient for [the neglect judge], who has retained the matter, to even allow [appellant] unsupervised visits with her son, much less reunification." Further, that "[u]ntil such time as [appellant] understands that she must deal with her mental problems ... it could never be in [the child's] best interests, for [appellant] to be his primary caretaker since her untreated mental health situation would have to affect his life, his world, and his ability to perceive and deal with reality."

possibly did not alert counsel to the fact that he also intended to take "judicial notice of certain adjudicative facts" as well as "certain pleadings, orders and findings of fact" in the neglect proceeding.[31] Appellant's counsel was on notice, however, before the show cause hearing began, and at no time objected, that the judge had reviewed "the file" to the extent that he had learned about appellant and had read the guardian's reports to the judge in the neglect proceeding. While the judge's reference to "the file" is imprecise, counsel did not ask for clarification, and in view of the consolidation of the neglect and adoption proceedings, counsel should have been aware of the likelihood that the judge was referring to the consolidated file. Included in the adoption file is a February 23, 1989, report from the Department of Human Services which was filed long before the show cause hearing, and it quoted from the "lengthy" report prepared by a doctor and a social worker appointed in 1986 to assess appellant and her child to determine whether appellant should be allowed to regain custody. The doctor and social worker concluded that appellant, whose "paranoia causes her to sequester herself and [her child]," "is suffering from a serious, progressive emotional disorder with poor prognosis for recovery." Finally, the comments of the guardian *ad litem* just before concluding his presentation, and the judge's apparent agreement with them, should have alerted appellant's counsel to the judge's intention to take judicial notice of the findings of fact and conclusions of law in the prior proceeding.

■ The objections to the sufficiency of the trial judge's findings would have been well taken had counsel alerted the judge to his objections to reliance on the neglect proceeding. *See, e.g., In re K.A.*, 484 A.2d 992, 995 (D.C.1984) (clear and convincing evidence required in termination of parental rights proceeding); *In re B.K.*, 429 A.2d 1331, 1333 (D.C.1981) (preponderance of evidence required to prove child neglect).[32] However, the trial judge's findings suggest that the findings by the judge in the neglect proceeding were used primarily to confirm that the same problems evident at the adoption show cause hearing had previously been observed. Furthermore, to the extent that appellant relies on appeal on the absence of psychiatric evidence regarding her present mental condition before the trial judge, the adoption proceeding file included the department's report, which quoted the psychiatric diagnosis presented in the neglect proceeding. The issuance of the show cause order put appellant and her counsel on notice that evidence would be required to counter the prior diagnosis. Since the adoption and neglect proceedings had been consolidated, and appellees requested the trial judge to take judicial notice of the court orders in the neglect proceeding, counsel for appellant also had to be aware that if the judge did so, the judge

---

**31.** In his findings of fact, the trial judge stated that he took judicial notice of:

the undisputed findings of fact and conclusions of law in the neglect action. The court also takes judicial notice of at least 10 separate orders in Docket No. N– 309–85 [the neglect proceeding] during the period October 1985 through June 1989,.... Summarized these orders, by [the neglect judge and other judges], required [appellant] to participate in parenting classes, seek therapy, follow through on referrals from the social worker to meet her needs, seek psychiatric or mental health evaluation and treatment. The purposes of the referrals was to have an evaluative tool available to the court to assess the state of her mental health in order to have [the child] returned to her care.

**32.** When a trial court decides to terminate parental rights or rules that a child has been neglected, these conclusions of law (sometimes called findings of ultimate fact) respectively require different standards of proof: clear and convincing evidence (termination) and preponderance of the evidence (neglect). This is not to say, however, that each of the subsidiary facts underlying the ultimate disposition must necessarily be supported by the same standard of proof that sustains the ultimate fact/conclusion. For example, there may be twenty facts, each proved by a preponderance of the evidence, that in the aggregate create clear and convincing evidence of the need for termination of parental rights. Therefore, it is not necessarily true, as appellant's argument implies, that none of the facts found in a neglect proceeding can be used in the termination proceeding unless each so-called neglect fact is proved by clear and convincing evidence.

would be aware of the orders regarding appellant's mental condition and her failures to follow up with therapy.[33]

Upon reviewing the trial judge's findings of fact, we are satisfied that the judge, after reciting the allegations of the neglect petition and summarizing the court orders in the neglect proceeding, by way of background, based virtually all of his findings of fact on the evidence that he heard at the show cause hearing and on the orders in the neglect proceeding to which appellant's counsel interposed no objection. Accordingly, in the absence of objection at trial, we find no miscarriage of justice.

## IV

■ Finally, appellant's third assignment of error arises from her view, by analogy to civil commitment and First Amendment rights, that due process requires the judge adopt the "least drastic means" possible for achieving the child's best interests. She maintains that the least drastic means available would have been to allow the child to remain in appellees' custody while continuing to visit with appellant, who would retain her parental rights.

In recognizing the due process rights of the natural parent, the court has, consistent with Supreme Court precedent, held that "natural parents' constitutional rights are relevant only to the question of what process is due in a termination proceeding, and such a proceeding requires no balancing of the parents' interests against those of the child." In re A.B.E., 564 A.2d 751, 755 (D.C.1989) (citations omitted); see also In re M.M.M., 485 A.2d 180, 184 (D.C.1984) (same).[34] Where the court has referred to the least detrimental alternative, moreover, it was addressing an alternative that was least detrimental to the child, not the natural parent. In re J.S.R., 374 A.2d 860, 863 (D.C.1977).[35]

On the other hand, the court has indicated concern regarding premature termination of parental rights and the abyss of perpetual foster care without adoption. See, e.g., In re A. W., 569 A.2d 168, 176 (D.C.1990) (Rogers, J., dissenting). These expressions have arisen as a result of interpretations of the District of Columbia statute, however, and not the Constitution.[36] Moreover, the considerations underlying those concerns are not present in the instant case since the termination was immediately followed by an adoption. Although the circumstances are similar in some respects to cases where a natural parent has maintained a loving relationship with the child,[37] the court has not interpreted the

---

**33.** In his conclusions of law, the trial judge stated:

Simply stated, even if [appellant] is perfectly able to raise her son and would receive approval from mental health experts, the court has no way to know since [appellant] has not submitted to further evaluation and if she has, has not provided any information to the social workers, who are agents of the court.

Indeed, the absent [sic] of treatment for the conditions and the bold assertion by [appellant] that no therapy is needed lend support to the presumption that her mental health status is unchanged since the [neglect] trial in 1986.

**34.** Appellant makes no procedural due process claim on this ground.

**35.** By statute and long-standing precedent in this jurisdiction, the best interest of the child is the paramount focus of the judge in custody disputes between a natural parent and a stranger as well as between spouses. E.g., In re A.B.E., supra, 564 A.2d at 754; In re J.S.R., supra, 374

A.2d at 863; D.C.Code § 16–2353(a) (1989); see also In re Baby Boy C., 581 A.2d 1141, 1173–74 (D.C.1990); D.C.Code §§ 16–309, –2353 (1989). In applying the best interests standard, the court has repeatedly explained, relying on the language of the statutes, that the interests of the natural parent cannot overcome the interests of the child in physical and mental health and continuity of care. See, e.g., In re Baby Boy C., supra, 581 A.2d at 1173 (D.C.1990) (opinion by Ferren, J.); In re A.B.E., supra, 564 A.2d at 755 (D.C.1989); In re M.M.M., supra, 485 A.2d 180; In re K.A., supra, 484 A.2d at 997–98 (D.C.1984); In re J.S.R., supra, 374 A.2d at 863–64.

**36.** D.C.Code § 16–2351 (1989) (authorizing the termination of parental rights where necessary to facilitate stability and "prompt adoptive placement"); id. at § 16–2353 ("continuity of care" of the child is a factor in termination of parental rights).

**37.** See, In re K.A., supra, 484 A.2d at 996; see also In re C.E.W., 541 A.2d 625, 627 (D.C.1988) (Rogers, J., concurring).

statute or the constitution to require that termination may only be ordered when necessary to free the child for immediate adoption or to avoid the instability of an unending series of foster care placements. *See, e.g., id.; In re K.A., supra,* 484 A.2d at 996; see also *In re C.E.W., supra* note 37, 541 A.2d at 627. Rather the court has focused on the absence of evidence that termination would result in any substantial good for the child. *In re A.B.E., supra,* 564 A.2d at 759. The cases relied on by appellant do not require the judge to resolve a custody dispute in terms of assuring the fewest possible restrictions on a non-custodial natural parent.[38] Even if another trial judge might possibly have concluded that stability for the child could have been achieved without adoption, there was no violation of appellant's due process rights.

Accordingly, the judgment is affirmed.

---

**38.** While *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982), identified a natural parent's interest in the care and custody of his or her child as a fundamental liberty interest, the Court held only that the decision to terminate parental rights must be supported by clear and convincing evidence. The Court did not also require a least-restrictive-means analysis for balancing the right of the child and the natural parent. As noted, appellant's reliance on *In re J.S.R., supra,* 374 A.2d 860, and *In re A.B.E., supra,* 564 A.2d 751, is misplaced.